**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| AMF BOWLING CENTERS, INC.; | § | CIVIL ACTION NO. |
| BOWLERO CORP., | § | |
| | § | 3:23-cv-00448 |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | **VERIFIED AMENDED** |
| | § | **COMPLAINT** |
| THOMAS TANASE, | § | |
| | § | **REDACTED** |
| *Defendant.* | § | |

Plaintiffs AMF Bowling Centers, Inc. ("AMF") and Bowlero Corp. (with AMF, "Bowlero" or the "Company"), by and through their attorneys, bring this Amended Complaint against defendant Thomas Tanase and allege as follows:

## NATURE OF THE DISPUTE

1.      Defendant Thomas Tanase ("Mr. Tanase") is the former Chief Information Officer of Bowlero, the largest owner and operator of bowling centers in the world.  In this role, Mr. Tanase had access to and responsibility for maintaining the confidentiality of Bowlero's proprietary, confidential, and trade secret information.  There were few, if any, individuals within Bowlero who had more responsibility for such tasks.  This suit arises out of Mr. Tanase's blatant breaches of his obligations to Bowlero.

2.      On May 15, 2023, Mr. Tanase lost his temper during a discussion with his supervisor that culminated in his yelling at his supervisor and resigning from the Company.  When, following that incident, Bowlero refused to allow Mr. Tanase to revoke his resignation, Mr. Tanase vowed to get "revenge" on the Company and to "bury" its CEO, Thomas Shannon.  Mr. Tanase then began to do just that.

3.      Specifically, from the effective date of his resignation, May 16, 2023, through June 13, 2023, Mr. Tanase repeatedly and illegally hacked into Mr. Shannon's Bowlero email account on a near-daily (if not daily) basis.  Among the highly sensitive and proprietary emails Mr. Tanase had access to and, upon information and belief, reviewed, were attorney-client privileged communications regarding Mr. Tanase himself, as well as other legal matters in which Mr. Tanase's now-lawyer, Daniel Dowe, has been adverse to Bowlero for approximately seven years. Of course, as the Company's former CIO, Mr. Tanase well understood he had no authority or right to read Mr. Shannon's emails *at any time*, let alone after his employment ceased.  But he did it anyway.

4.      In addition to hacking into Mr. Shannon's email account, Mr. Tanase initially refused to return all but one Bowlero-issued device for over a month following his resignation, as he was contractually obligated and directed to do, and as Bowlero's corporate policy required. And Bowlero's forensic examination of one of those devices—a Dell XPS laptop—reveals that Mr. Tanase accessed that device after his resignation when he was no longer authorized to do so. Worse, he accessed that device to first ***wipe its contents completely clean*** and then, after learning from his review of Mr. Shannon's emails that Bowlero would be performing a forensic examination of his devices, re-booted the Dell XPS with Windows software and ***copied over 2,100 documents*** on to that laptop from where he had apparently saved them onto a personal USB drive. Mr. Tanase has not turned that USB drive over to Bowlero.

5.      When Mr. Tanase received a June 17 cease and desist letter from Bowlero's outside counsel demanding a written accounting of all information Mr. Tanase obtained from the devices and Mr. Shannon's emails as well as information regarding his distribution of that information, Mr. Tanase did not offer any explanation for Bowlero's findings.  Instead, he hired Mr. Dowe,

-2-

who wrote to Bowlero on Mr. Tanase's behalf but declined to respond to the cease and desist demands.  Instead, Mr. Dowe claimed that Mr. Tanase has given him additional evidence to support Mr. Dowe's seven-year-old legal vendetta against the Company.  Upon information and belief, that additional "evidence" includes confidential information retained post-resignation and attorney-client privileged information that Mr. Tanase unlawfully obtained.

6.      Given Mr. Tanase's unlawful conduct and his refusal to comply with Bowlero's June 17 demands or even meaningfully respond to the allegations therein, Bowlero has serious concerns that Mr. Tanase has and is continuing to disclose its confidential information to third-parties, including Bowlero's long-time litigation adversary.

7.      Bowlero brings this action against Mr. Tanase for his violations of the Computer Fraud and Abuse Act ("CFAA") and the Virginia Computer Crimes Act ("VCCA") and for his trespass to chattels and breaches of contract.  Bowlero also seeks a temporary restraining order and preliminary injunction requiring Mr. Tanase, his agents, and all those acting in active concert or participation with Mr. Tanase to: (i) refrain from accessing or extracting any data from Bowlero's computers, systems, or other data; (ii) refrain from disclosing to any third party any proprietary material or confidential information; (iii) identify, in writing and under oath, the identity of any persons or entities to which they have disclosed any proprietary material or confidential information; and (iv) make all devices within their possession, custody, or control, which contain or ever have contained proprietary material or confidential information (including but not limited to the three USB devices connected to the Dell XPS on June 6, 2023), available for Bowlero's inspection.

## PARTIES AND RELEVANT NON-PARTIES

8.      Plaintiff AMF Bowling Centers, Inc. is a Virginia corporation with its principal place of business in Mechanicsville, Virginia.  AMF Bowling Centers, Inc. was formed in 2013

when AMF Bowling Worldwide, Inc. reorganized and merged with Strike Holdings LLC.  AMF Bowling Centers, Inc. is a wholly owned subsidiary of Bowlero Corp.

9.      Plaintiff Bowlero Corp. is a Delaware corporation and a publicly traded company with its principal place of business in Mechanicsville, Virginia.  Bowlero Corp. is the largest owner and operator of bowling centers in the world, with over 8,000 employees.

10.     Defendant Thomas Tanase is a former employee of AMF who worked out of Bowlero's corporate headquarters in Mechanicsville, Virginia.  Mr. Tanase is a resident of Virginia with an address at: 7991 Kenmore Drive, Mechanicsville, Virginia 23111.

11.     Non-party Daniel Dowe is an attorney based in New York and the founder of Dowe Partners LLC.  Mr. Dowe has been adverse to Bowlero in legal matters since as early as 2016.  In July 2017, Mr. Dowe filed a lawsuit against Bowlero in the Supreme Court of the State of New York, County of Oneida (the "Oneida Action"), which lawsuit was dismissed with prejudice.  In dismissing the Oneida Action, the Court sanctioned Mr. Dowe, who the Court found "acted in a frivolous manner in that his conduct in the prosecution of this matter was undertaken in a manner that served no purpose other than to harass or maliciously injure defendants in this action."  Mr. Tanase became a client of Mr. Dowe's after Mr. Tanase's resignation.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction over Count I of this matter (asserting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g)) pursuant to 28 U.S.C. § 1331 because this claim arises "under the Constitution, laws, or treaties of the United States."  The Court may exercise supplemental jurisdiction over the Company's remaining state law claims pursuant to 28 U.S.C. §§ 1367 and 1441(c) because the state claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

-4-

13.     This Court has general personal jurisdiction over Mr. Tanase because Mr. Tanase has a residence within this District in Virginia.  Further, this court has personal jurisdiction over Mr. Tanase because he directed his unlawful activities at Virginia, the state where he was employed by the Company, where Bowlero's email servers are located, and from where he committed the offenses enumerated herein.

14.     Venue is proper in the Richmond Division of the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Mechanicsville, Virginia, and "a substantial part of property that is the subject of the action is situated" in Henrico County, within this Division.  Specifically, the email servers that Mr. Tanase accessed without authorization are located in Sandston, Virginia, within Henrico County and owned and operated by Bowlero.

## FACTUAL ALLEGATIONS

15.     Mr. Tanase was hired by Strike Holdings LLC, a predecessor of Bowlero, on June 10, 2002, as the Senior Vice President of Information Technology.  In the following twenty-one years, Mr. Tanase rose through the ranks of Bowlero's IT function.

### A.      Mr. Tanase's Employment Agreement

16.     On November 10, 2015, Mr. Tanase executed a "Confidential Information and Work Product Assignment Agreement" (the "Employment Agreement") with AMF and its affiliates and subsidiaries that set forth the terms and conditions of his continued employment with Bowlero.

17.     By executing the Employment Agreement, Mr. Tanase acknowledged:

During the period of my employment, I will be exposed to certain trade secrets, proprietary information and other information concerning matters relating to the business of the Company, including information concerning client affairs, bowling league contacts, customer lists, vendors, company operations, personnel, finances, strategies, intellectual property, technology, plans, policies, strengths, weaknesses,

marketing, real estate, assets, risk, legal compliance, Work Product and other company related information ("Confidential Information"). I acknowledge that this Confidential Information is valuable, special, and unique to Company's business and that it is in the legitimate business interest of Company to restrict my disclosure or use of Confidential Information. ***I agree at all times during the term of my employment and at all times thereafter, to hold in strictest confidence, and not to use or disclose to any person, firm or corporation, except for the direct benefit of the Company related to my work, any Confidential Information***. . . . All Confidential Information shall remain the sole and exclusive property of the Company.

Ex. A § 2 (emphasis added).

18.     Mr. Tanase further committed to "return all documents and other tangible materials, whether or not pertaining to Work Products or Confidential Information, furnished to or accessed by me or produced or obtained by me in connection with my work hereunder upon my termination of employment or at any time upon request." *Id.* § 10.

19.     The Employment Agreement includes an arbitration provision for "any dispute or controversy arising out of any interpretation, enforcement, or breach of this agreement," *id.* § 22, but allows for the Company to obtain equitable relief, including an order "restraining [a] breach or threatened breach and to specific performance of any such provision of this Agreement," *id.* § 14.

**B.     Mr. Tanase Resigns And Vows To Get "Revenge" On Bowlero And To "Bury" Its CEO**

20.     On May 15, 2023, Mr. Tanase lost his temper during a discussion with his supervisor that culminated with Mr. Tanase screaming, swearing, and announcing that he was resigning. The next day, Mr. Tanase attempted to withdraw his resignation, but Bowlero did not accept his revocation of resignation. Bowlero advised Mr. Tanase that his resignation was effective May 16, 2023.

21.     Upon his resignation, and pursuant to his Employment Agreement, Mr. Tanase was required to "return all documents and other tangible materials, . . . furnished to or accessed by [him] or produced or obtained by [him] in connection with [his employment] . . . ." Ex. A, § 10.

22.     Further, Bowlero's Company policy on "Corporate-Owned Data Devices", which Mr. Tanase was fully familiar with through his capacity as CIO of Bowlero, and which is posted on the Company's intranet, provides that "[a]ll corporate-owned devices and accessories must be returned to the Company IT Department at conclusion [of] the device loan period or employment."

23.     And, Bowlero's Company policy on "Unique IDs and Passwords", which Mr. Tanase was also fully familiar with and which was also posted on the Company's intranet, provides that "[a]ll access to network and computer systems will be revoked . . . for any terminated, furloughed or suspended users."

24.     Further, immediately following Mr. Tanase's resignation, Bowlero took measures to ensure that he could no longer access its computer systems or servers.  In particular, on May 16, 2023, Bowlero terminated Mr. Tanase's user ID and login credentials to Bowlero's IT systems and servers.  Mr. Tanase was not authorized to access, or attempt to access, Bowlero's computer systems or servers through other channels.

25.     On May 31, 2023, Bowlero's Vice President of Human Resources, Heather Webb, called Mr. Tanase.  During that call, Mr. Tanase told Ms. Webb that he was so upset with the Company and Mr. Shannon.  He threatened: "I am going to bury Tom," referring to Bowlero's CEO, Mr. Shannon, and claimed he would get "revenge" or "retribution" against the Company and Mr. Shannon.

26.     During that May 31 conversation, Mr. Tanase told Ms. Webb that he had spoken with CNBC and several lawyers, including attorney Daniel Dowe, about the Company.  Mr. Dowe

has been representing parties adverse to Bowlero in ongoing legal matters since 2016.  Mr. Tanase said he would "walk away", which Ms. Webb understood to mean that he would no longer attempt to seek revenge or retribution on Bowlero or Mr. Shannon, if Bowlero were to pay him a $1.2 million "severance" payment.  Bowlero has refused to make this payment.

27.    Also on May 31, Ms. Webb emailed Mr. Tanase's personal email address requesting that he return the outstanding Bowlero-issued devices.

**C.    Bowlero Discovers Mr. Tanase's Hacking Into Its CEO's Email Account**

28.    Given the manner in which Mr. Tanase's employment ended, including his threats shortly after his resignation, the Company undertook an investigation to determine whether Mr. Tanase was still attempting to access any Company computers, servers, and/or confidential information.

29.    On June 13, 2023, through its investigation, Bowlero discovered that, since at least May 16, 2023 (the effective date of his resignation), Mr. Tanase had been routinely, frequently, and improperly accessing Mr. Shannon's emails, sometimes multiple times a day.

30.    In particular, as part of his investigation, Bowlero's Vice President of Information Technology, Kevin Crossman, reviewed the Company's Duo authentication logs.  Duo is a program that allows remote access to Bowlero's email servers via webmail.  At each remote login, Duo creates a record of the time and physical location from which the webmail login occurred. Among other information, the Duo logs record the IP address associated with the device accessing the given email account via webmail.  An IP address is a unique strand of numbers assigned to each device that is connected to the internet.

31.    In particular, Mr. Crossman reviewed the Duo logs associated with Mr. Shannon's Bowlero email account dating from April 14 to June 13, 2023.  The Duo logs for Mr. Shannon's

email account show multiple logins from IP address ███████████ and IP address ███████████. A review of the Duo logs associated with Mr. Tanase's Bowlero email account shows that the above-referenced IP addresses are IP addresses associated with devices Mr. Tanase frequently used to access his emails while he was employed by Bowlero.  IP address ███████████ is also associated with Mr. Tanase's Bowlero-issued laptop in data found on the Company's cloud-based, anti-malware software application.  In other words, there can be no dispute that each time the Duo logs reflect the above-referenced IP addresses accessing Mr. Shannon's email account, it was Mr. Tanase himself operating the devices associated with those IP addresses.

32.     The Duo logs reveal that, since Mr. Tanase's effective date of resignation, Mr. Tanase had accessed Bowlero's email server and, in particular, Mr. Shannon's email account, on multiple occasions, sometimes multiple times per day with devices associated with the above-referenced IP addresses.  Specifically, the Duo logs for Mr. Shannon's email account show that Mr. Tanase accessed Mr. Shannon's email account from Virginia on or after his resignation using a device associated with IP address ███████████ on May 16, May 17, May 18, June 6, June 7, June 8, June 9, June 12, and June 13.  On May 17, Mr. Tanase accessed Mr. Shannon's email account *five times*.  And, on June 8, Mr. Tanase accessed Mr. Shannon's email account *four times.*

33.     The Duo logs also reveal that Mr. Tanase logged on to Mr. Shannon's email account from Connecticut using a device associated with IP address ███████████ on June 2, June 3, June 4, and June 5.  On June 2, Mr. Tanase accessed Mr. Shannon's email account *four times*.  And, on June 5, Mr. Tanase accessed Mr. Shannon's email account *three times*.

34.     Mr. Tanase accessed Mr. Shannon's email account by using Mr. Shannon's log-in credentials that Mr. Tanase was provided prior to his resignation and solely as part of his work within the Company's IT function.  Mr. Tanase never had permission to review Mr. Shannon's

emails, including when he was actually employed by Bowlero.  Any authority Mr. Tanase had to access Mr. Shannon's email account using Mr. Shannon's credentials was solely to facilitate the workings of Bowlero's IT functions, and that authority was revoked upon his resignation as a matter of practice, policy, and contract.

35.     Mr. Shannon's email account contains highly confidential and proprietary information, including information regarding business plans and marketing strategies, Bowlero's financial information and performance, and discussions regarding employee matters, much of which are "Confidential Information" as defined by the Employment Agreement.  Indeed, the emails that Mr. Tanase accessed after his resignation contain some of Bowlero's most competitively sensitive information.  Mr. Shannon is also in regular correspondence with in-house and outside counsel on various legal matters.  During the period in which Mr. Tanase accessed Mr. Shannon's email, Mr. Shannon had exchanged privileged communications with counsel regarding Mr. Tanase himself, as well as other legal matters in which Mr. Tanase's counsel, Mr. Dowe is involved.

36.     Immediately after discovering that Mr. Tanase was hacking into its CEO's email account, Bowlero took measures to ensure Mr. Tanase could no longer access Mr. Shannon's account.  In particular, on the evening of June 13, 2023, Mr. Crossman worked with Mr. Shannon to change Mr. Shannon's email password.  Mr. Crossman also instituted a firewall block against Mr. Tanase's IP address ████████.

37.     After imposing the firewall block on Mr. Tanase's IP address ████████, Bowlero's firewall logs show that Mr. Tanase *continued* to attempt to access Bowlero's servers but was unable to do so.

### D.       Mr. Tanase Refuses To Comply With Bowlero's Cease And Desist Letter

38.     On June 17, counsel for Bowlero sent Mr. Tanase a cease and desist letter (the "June 17 Letter") regarding his post-resignation conduct.  Therein, counsel notified Mr. Tanase that Bowlero was well aware of his unauthorized access to its email servers and noted that such conduct violates the CFAA and the VCCA, among other offenses.  Counsel also noted that Mr. Tanase had, to that date, refused to return all of his Bowlero-issued devices and that his failure to do so was a breach of the Employment Agreement and constituted conversion of Bowlero's property.

39.     The June 17 Letter demanded that, within 24 hours of receipt thereof, Mr. Tanase write to confirm that he would:

- Immediately return all Company-issued devices to Bowlero without manipulating those devices in any way and without extracting or saving any data thereon.

- Identify all documents, communications, information, or data that [he has] taken from any Bowlero server, email platform, cloud hosting service, or any Bowlero-issued device.

- Explain in detail what, if anything, [he has] done with the information [he has] learned from reading Mr. Shannon's emails since [his] termination; whether [he had] downloaded any of that information; and with whom he [had] shared or discussed that information.

- Provide [counsel] with all documents and communications concerning [Mr. Tanase's] accessing Mr. Shannon's emails, including all documents and communications concerning any information [Mr. Tanase had] learned from reading Mr. Shannon's emails.

- Commit that [he] will cease disclosing confidential information [he] received from Bowlero to anyone.

40.     Aside from belatedly returning certain Bowlero-issued devices on June 20, 2023 (discussed below), Mr. Tanase refused to comply with the above demands.  Critically, Mr. Tanase failed to provide any written response thereto, including one that denied that he had in fact copied or taken any documents, information, communications, or data from Bowlero or disclosed any

such information to any third-party.  Instead, during a phone conversation with a Bowlero executive, Mr. Tanase incredibly denied the allegations in the June 17 Letter and could not offer any explanation as to why Bowlero's logs were showing his repeated access to Mr. Shannon's email account.

41.     Bowlero received a letter from Mr. Dowe on June 22, 2023 confirming that his firm had "just" been retained by Mr. Tanase.  Mr. Dowe further stated that "adding Mr. Tanase to our group and our case against Bowlero has significantly added to the evidence of wrongdoing in matters before the [Equal Employment Opportunity Commission] and beyond," referring to the other matters in which Mr. Dowe is representing adversaries of Bowlero.  Mr. Dowe's letter did not deny any of the allegations set forth in the June 17 Letter, nor did it commit that Mr. Tanase would comply with the demands set forth therein, including the demand that Mr. Tanase commit to "cease disclosing confidential information to anyone."  Nor did Mr. Dowe's letter deny that Mr. Tanase had in fact copied or taken any documents, information, communications, or data from Bowlero after his resignation or that Mr. Tanase still has such material in his possession.

42.     On June 20, 2023—over a month after his resignation, Mr. Tanase finally returned to Bowlero a Dell XPS laptop, an iPad Pro, a reMarkable 2 tablet, and a HP windows tablet (together, the "Bowlero Devices").

43.     The Dell XPS was issued to Mr. Tanase in or around February 2021 and was Mr. Tanase's primary work laptop since that date.  As with all company-issued PCs, the Dell XPS was pre-installed with Windows Pro software.

44.     On or around June 1, 2023, Bowlero engaged third-party Sage Intelligence Group, LLC ("Sage") to conduct a forensic examination of the Bowlero Devices.

45.     Using Magnet Forensics software, Sage analyzed a forensic image of the Dell XPS. The Magnet Forensics software creates logs of historical activity on a computer hard drive.  In this case, the Dell XPS did not reflect any activity on the Dell XPS prior to June 6, 2023.

46.     However, event logs reveal that on June 6, 2023, three unique external devices were connected to the Dell XPS model.  The first access involved a JetFlash Transcend 64GB USB drive (the "JetFlash").  This drive was first connected to the laptop at 1:21 p.m. and removed at 2:12 p.m. on June 6, 2023.  The second access involved a Samsung T7 Touch drive (the "Touch"). This drive was connected to the laptop at 2:41 p.m. and removed at 2:46 p.m. on June 6, 2023. The third access involved a Kingston DataTraveler 3.0 USB Device (the "Kingston").  This drive was connected to the laptop at 3:27 p.m. and removed at 3:54 p.m.

47.     The first drive, the JetFlash, is an ESD (Electronic Software Delivery) Device.  The name "ESD Device" is a naming convention for a flash drive that can be used to install a Windows operating system.  Accordingly, using the JetFlash, Mr. Tanase installed a Windows operating system on the Dell XPS.

48.     The lack of any recorded events in the Dell XPS history before June 6, as well as the installation of Windows on June 6—on a device that had been issued to Mr. Tanase with Windows already installed—are extremely strong evidence that Mr. Tanase wiped clean the Dell XPS device at some point prior to June 6, 2023 and, upon information and belief, after his resignation.

49.     After installing Windows on June 6, Mr. Tanase connected the Touch to the Dell XPS.  The Touch remained connected to the laptop for a five-minute period on the afternoon of June 6.  Metadata of documents located on the Dell XPS shows that over 2,100 documents were "created" on June 6, 2023 in the same five-minute window during which the Touch was connected

(the "June 6 Created Documents").  The metadata for the June 6 Created Documents also indicate that the documents were "last modified" *prior* to June 6, 2023.  The logical inference arising from this activity is that Mr. Tanase copied the June 6 Created Documents from the Touch to the Dell XPS on June 6, 2023.

50.   Further, a number of folders on the Dell XPS laptop's C Drive were "last accessed" on June 6, 2023.

51.   In order to upload the materials to the laptop on June 6, Mr. Tanase had to have removed the June 6 Created Documents from Bowlero's systems at some point before June 6. Upon information and belief, Mr. Tanase put the June 6 Created Documents on to the Dell XPS on June 6, before returning the laptop to Bowlero, so that it would not appear to Bowlero that Mr. Tanase had deleted or taken documents from the Dell XPS.  Because Mr. Tanase wiped clean the Dell XPS laptop prior to June 6, Bowlero is unable to confirm what activity occurred prior to that date, including when Mr. Tanase may have accessed files en masse which could suggest the transfer of materials onto an external hard drive such as the Touch.  Upon information and belief, Mr. Tanase has retained copies of the June 6 Created Documents on the Touch and potentially other devices currently in his possession.

52.   Many of the June 6 Created Documents are Confidential Information as defined in the Employment Agreement.  For example, the June 6 Created Documents include:

   a.   Information relating to Bowlero's vendors, which the Employment Agreement defines as "Confidential Information," including documents titled "Bowlero Engagement Letter_19DEC2018.doc," "202 – Template Consulting Agreement v1.doc," (engagement letters and draft engagement letters with consultants); descriptions of work performed for Bowlero by its vendors; and "AP

Check Detail_08.18.21-12.22.21.xlsx" (an excel spreadsheet reflecting payments to vendors from August 18 to December 22, 2021, including a (1) a tab listing "AP Check Detail" by geographic region; (2) a 16,236-row tab listing vendor invoices and amounts and (3) a tab noting "This Report Requires Company Level Security" that lists consolidated "AP Check Details").

b.        Information relating to Bowlero's plans, which the Employment Agreement defines as "Confidential Information," including documents titled "LeaguesProjectMaster 2018-06-26.xlsx" (a chart of projects to optimize Bowlero's bowling league platform), "Resource Plan 03_09_2020.xlsx" and "Resource Planning 6-10-2019.xlsx" (spreadsheets setting out Bowlero's allocation of resources across different projects and staff members);

c.        Information relating to Bowlero's strategies, which the Employment Agreement defines as "Confidential Information," including documents titled "IT Steering Committee Minutes" spanning several months and documents relating to a pending acquisition, and;

d.        Information relating to Bowlero's finances, which the Employment Agreement defines as "Confidential Information," including documents titled "CNB Credit Card," "CNB Disbursements," and "CNB Payroll" (Bowlero's financial records with City National Bank spanning several months); a file titled "PBA Payroll File Bonus.xlsx" (listing, for certain employees, 2018 annual salaries, bonuses, and respective divisions).

53.     The June 6 Created Documents include Bowlero-related documents from 2012 through 2023.

54.     Mr. Tanase is poised to cause irreparable harm to the Company through the dissemination of information and/or materials he has improperly accessed both through hacking into Mr. Shannon's emails and by accessing the Dell XPS and potentially other Bowlero-issued devices after his resignation (such materials hereinafter referred to as the "Proprietary Materials"). These Proprietary Materials include "Confidential Information" as defined by the Employment Agreement, including sensitive and confidential, proprietary documents relating to Bowlero's business plans, strategies, finances, and vendors, as well as confidential emails of a similar nature and privileged attorney-client communications and work product in Mr. Shannon's inbox.

55.     In this case, there is a particularly heightened risk of immediate and irreparable harm to Bowlero because Mr. Tanase has already threatened retaliation against the Company and its CEO personally, including potentially by disclosing sensitive material to CNBC and Mr. Dowe, who is adverse to Bowlero in a number of legal disputes and who now represents Mr. Tanase.  The disclosure of such Proprietary Materials and privileged information to any third parties could interfere with Bowlero's competitive advantages in the industry and could reveal to its litigation adversaries its litigation strategies.  Accordingly, there is good reason to be concerned that Mr. Tanase already has and will continue to disclose the materials he has improperly accessed and/or copied post-resignation in an attempt to harm Bowlero.

### FIRST CLAIM FOR RELIEF

### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g))

56.     Bowlero adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

57.     The Bowlero computer systems and email servers that Mr. Tanase accessed after his employment ended constitute "computers" within the meaning of the CFAA because they store electronic data.

-16-

58.     The Bowlero computer systems and email servers that Mr. Tanase accessed constitute "protected computers" within the meaning of the CFAA because they are used in or affecting interstate or foreign commerce or communication and are connected to the internet.

59.     By accessing Bowlero's email servers and Bowlero-issued devices after his employment ceased, Mr. Tanase intentionally accessed Bowlero's computer systems and email servers without authorization.

60.     In particular, after May 16, 2023, the effective date of Mr. Tanase's resignation, any authorized access Mr. Tanase previously had to Bowlero's email servers or Bowlero-issued devices was permanently revoked.  Mr. Tanase knew that he was not authorized to access Bowlero's computer systems and email servers after his resignation.  First, ex-employees do not have authorization to continue to access Bowlero's computer systems and servers.  Having worked in Bowlero's IT function for twenty-one years, Mr. Tanase knew this to be the case.  And Mr. Tanase also understood that he was no longer authorized to access Bowlero's computer servers and systems because he knew that Bowlero terminated his user credentials after his resignation. Second, Mr. Tanase's Employment Agreement requires him to return Bowlero-issued devices and Bowlero documents upon the cessation of his employment, and, as former CIO, he was aware of the Company's written policy terminating former employees' access to computer systems and servers.  Finally, Mr. Tanase was instructed to return the devices on May 31 if not earlier.

61.     Mr. Tanase intentionally and without authorization accessed Bowlero's computer systems and servers after his resignation.  Mr. Tanase took these steps in order to obtain non-public Proprietary Material, including Confidential Information.

62.     Mr. Tanase's unauthorized access has already caused or will cause Bowlero to lose in excess of $5,000 during a one-year period.  In particular, Bowlero has suffered damages in the

form of costs to investigate Mr. Tanase's computer hacking and unauthorized access to its computer systems and servers, including through the costs of its own employees' investigation and remediation and the hiring of a third-party forensics firm to determine the scope of Mr. Tanase's offenses, and by engaging legal counsel to prosecute Mr. Tanase's computer hacking violations and seek the relief requested herein.

63.     Bowlero seeks damages under 18 U.S.C. § 1030(g) in an amount to be proven at trial.  Bowlero also seeks a preliminary and permanent injunction prohibiting Mr. Tanase from accessing Bowlero's computer systems or servers.  Bowlero has already been caused to suffer irreparable harm on account of Mr. Tanase's violations of the CFAA and will continue to suffer further irreparable harm if Mr. Tanase's conduct is not enjoined.

## SECOND CLAIM FOR RELIEF

### (Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et. seq.*)

64.     Bowlero adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

65.     In connection with its regular business operations, Bowlero maintains much of its IT network on servers located in Virginia.  Those servers are "property" within the meaning of Va. Code § 18.2-152.2.  The Bowlero-issued devices, including the Dell XPS, were also located in Virginia.

66.     Mr. Tanase knowingly acted without authority when he accessed Bowlero's computers and systems located in Virginia (including Mr. Shannon's email account and the Dell XPS) after his employment, at which time he had no authorization to access Bowlero's computer systems and servers.

67.     Without authority, Mr. Tanase has repeatedly and with malicious intent gained unauthorized access to Bowlero's computer systems and data with the intent to obtain information therefrom to use that information for improper purposes.

68.     Upon information and belief, Mr. Tanase unlawfully accessed Bowlero's computer systems and servers for the purpose of sharing Bowlero's Proprietary Matter and Confidential Information with third-parties in an attempt to exact "revenge" on Bowlero and to "bury" Mr. Shannon, as he promised.

69.     Upon information and belief, Mr. Tanase unlawfully copied confidential information from the Dell XPS and/or other Bowlero-issued devices or Bowlero systems and servers on to at least one USB drive after his resignation.

70.     Mr. Tanase unlawfully altered, disabled, and/or erased computer data from the Dell XPS after his resignation and removed computer programs and software from the Dell XPS after his resignation.

71.     The foregoing acts have caused injury and damage to Bowlero, including but not limited to causing Bowlero to expend resources and money to investigate the extent of Mr. Tanase's offenses.  In particular, Bowlero has suffered damages in the form of costs to investigate Mr. Tanase's computer hacking and unauthorized access to its computer systems and servers, including through the costs of its own employees' investigation and remediation and the hiring of a third-party forensics firm to determine the scope of Mr. Tanase's offenses, and by engaging legal counsel to prosecute Mr. Tanase's computer hacking violations and seek the relief requested herein.

72.     Bowlero has also suffered monetary damages in an amount to be proven at trial.

73.     Bowlero also seeks a preliminary and permanent injunction prohibiting Mr. Tanase from accessing Bowlero's computer systems or servers.  Bowlero has already been caused to suffer irreparable harm on account of Mr. Tanase's violations of the VCCA and will continue to suffer further irreparable harm if Mr. Tanase's conduct is not enjoined.

### THIRD CLAIM FOR RELIEF

### (Trespass to Chattels)

74.     Bowlero adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

75.     After his resignation, Mr. Tanase repeatedly and intentionally accessed Bowlero's email servers, including the data and information contained therein, without authorization, through the unauthorized use of Mr. Shannon's email login credentials.

76.     After his resignation, Mr. Tanase repeatedly and intentionally accessed Bowlero-issued devices, including the Dell XPS and the data and information contained therein, without authorization.

77.     Bowlero's email servers and the Bowlero-issued devices are property of Bowlero that Mr. Tanase had no authorization to access after his resignation.

78.     The foregoing acts have caused injury and damage to Bowlero and its chattel. Bowlero's security, goodwill and reputation, servers, computer network, emails, and confidential documents have been damaged on account of Mr. Tanase's misconduct.  Bowlero seeks damages in an amount to be proven at trial.

79.     Mr. Tanase's acts of trespass have been undertaken intentionally with malice or such recklessness or negligence as to evince a conscious disregard of the rights of others, justifying the imposition of punitive damages in an amount sufficient to punish and deter Mr. Tanase and warn others.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract)

80.     Bowlero adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

81.     On November 10, 2015, in consideration of his continued employment with Bowlero, Mr. Tanase executed the Employment Agreement.  The Employment Agreement is a binding and enforceable contract.

82.     Bowlero complied with each of its obligations under the Employment Agreement.

83.     By executing the Employment Agreement, Mr. Tanase "agree[d] at all times during the term of [his] employment *and at all times thereafter*, to hold in strictest confidence, and *not to use or disclose* to any person, firm or corporation, except for the direct benefit of the Company related to [his] work, any Confidential Information."

84.     The Employment Agreement defines "Confidential Information" as "certain trade secrets, proprietary information and other information concerning matters related to the business of the Company, including information concerning client affairs, bowling league contracts, customer lists, vendors, company operations, personnel, finances, strategies, intellectual property, technology, plans, policies, strengths, weaknesses, marketing, real estate, assets, risk, legal compliance, Work Product and other company related information."

85.     Mr. Tanase breached Section 2 of the Employment Agreement by obtaining Confidential Information from Mr. Shannon's emails and from the Dell XPS after his resignation and by using that information for his own personal benefit rather than solely "for the direct benefit of the Company related his [his] work."

86.     Further, upon information and belief, Mr. Tanase also breached Section 2 of the Employment Agreement by sharing Confidential Information with third-parties, including

privileged communications pertaining to Mr. Dowe, with Mr. Dowe.  And, upon information and belief, if not enjoined, Mr. Tanase will continue to breach Section 2 of the Employment Agreement by sharing Confidential Information with third-parties.

87.     Under Section 10 of the Employment Agreement, Mr. Tanase agreed to "return all documents and other tangle materials . . . furnished to or accessed by [him] or produced or obtained by [him] in connection with [his] work hereunder upon [his] termination of employment or at any time upon request."

88.     Upon information and belief, Mr. Tanase has breached Section 10 of the Employment Agreement by maintaining copies of "documents . . . furnished to or accessed by [him] or produced or obtained by [him] in connection with [his] work" after his resignation.  Such documents include, at a minimum, the June 6 Created Materials that, upon information and belief, remain on at least one USB device in Mr. Tanase's possession.

89.     As a result of any one of these breaches of the Employment Agreement, Bowlero has suffered and will continue to suffer damages and faces irreparable injury for which damages will not be a sufficient remedy, including by losing its competitive advantages and by the disclosure of its privileged attorney-client communications regarding ongoing legal matters with an adversary of Bowlero.

90.     Pursuant to Section 14 of the Employment Agreement, Bowlero seeks equitable remedies before this Court with respect to Mr. Tanase's breaches of the Employment Agreement. In particular, Bowlero seeks an injunction restraining any further breaches of the Employment Agreement and of specific performance of the Employment Agreement and the relief requested below.

91.     Bowlero intends to bring the merits of its breach of contract claim before the American Arbitration Association consistent with Section 22 of the Employment Agreement.

## JURY DEMAND

92.     Bowlero requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bowlero Corp. prays as follows:

(a)     Judgment in Bowlero's favor and against Mr. Tanase on Counts I through III herein;

(b)     Compensatory damages as a result of Mr. Tanase's unlawful acts and omissions in an amount to be proven at trial, including but not limited to legal, investigatory, and other costs; reputational harms and loss of goodwill and business revenue; together with reasonable attorneys' fees, pre-judgment and post-judgment interest as allowed by law, costs, and additional costs of collection;

(c)     Punitive damages in an amount to be proven at trial and sufficient in amount to punish and deter the egregious, intentional, wanton, willful, reckless, and malicious conduct described in this Complaint;

(d)     Temporary, preliminary and permanent injunctions

      i.     requiring Mr. Tanase to identify to Bowlero's counsel of record, in writing and under oath, the identity and last-known contact information, including the title, email address, telephone number, employer and other identifying information in Mr. Tanase's possession, custody or control, of the individuals, groups, companies, governmental entities, or other persons or entities, if any, to whom Mr. Tanase and, as applicable, Mr. Tanase's agents and all of those acting in active concert with Mr. Tanase, have disclosed,

transferred, published, distributed, broadcasted, or marketed any Proprietary Material or Confidential Information (as defined herein);

ii.    requiring Mr. Tanase and his agents and all of those acting in active concert or participation with Mr. Tanase, to make the following items in their possession, custody, or control (and not previously returned to Bowlero) available to Bowlero's counsel of record for forensic imaging and data preservation purposes: any computer (laptop and/or desktop) and every form of media, including but not limited to electronic storage devices, external hard drives, zip drives, memory sticks, jump drives, USB/flash drive devices, email accounts or other cloud storage devices which contain or have ever contained Proprietary Material or Confidential Information (as defined herein), including but not limited to the three USB devices connected to the Dell XPS laptop on June 6, 2023;

iii.    requiring Mr. Tanase to comply with his post-resignation contractual obligations under the Employment Agreement, including with respect to Sections 2 and 10 thereof;

iv.    barring Mr. Tanase and his agents and all those acting in active concert or participation with Mr. Tanase from further accessing or extracting any data from Bowlero's computers, computer systems, computer network, computer programs, or data;

v.    barring Mr. Tanase from disclosing any Proprietary Material or Confidential Information to any third party; and

-24-

vi.     permitting Bowlero to commence discovery before any Rule 26(f) conference pursuant to Rule 26(d)(1).

(e)     Such other and further relief as the court may deem to be just and proper.

Dated:  October 16, 2023

Respectfully submitted,

**AMF BOWLING CENTERS, INC. and BOWLERO CORP.**

/s/ *Neil S. Talegaonkar*
Randy C. Sparks, Jr. (VSB No. 40723)
Neil S. Talegaonkar (VSB No. 44589)
Catrina C. Waltz (VSB No. 98446)
KAUFMAN & CANOLES, P.C.
1021 East Cary Street, Suite 1400
Richmond, VA 23219
Phone:   (804) 771-5700
Fax:       (888) 360-9092
Emails:  rcsparks@kaufcan.com
               nstalegaonkar@kaufcan.com
               ccwaltz@kaufcan.com

Alex Spiro (NY Bar No. 4656542)
(Admitted *Pro Hac Vice*)
Hope D. Skibitsky (NY Bar No. 5362124)
(Admitted *Pro Hac Vice*)
Daniel Sisgoreo (NY Bar No. 5812417)
(Admitted *Pro Hac Vice*)
QUINN EMANUEL URQUHART
& SULLIVAN LLP
51 Madison Avenue, Floor 22
New York, NY 10010
Phone:   (212) 849-7000
Fax:       (212) 849-7100
Emails:  alexspiro@quinnemanuel.com
               hopeskibitsky@quinnemanuel.com
               danielsisgoreo@quinnemanuel.com

Asher B. Griffin (TX Bar No. 24036684)
(Admitted *Pro Hac Vice*)
300 West 6th St., Suite 2010
Austin, TX 78701
Phone:   (737) 667-6100
Fax:        (737) 667-6110
Email: ashergriffin@quinnemanuel.com

*Counsel for Plaintiffs AMF Bowling
Centers, Inc. and Bowlero Corp.*