## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| AMF BOWLING CENTERS, INC., ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     **Case No: 3:23-cv-448** |
| | ) |
| THOMAS TANASE, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### DEFENDANT'S COUNTERCLAIMS

DEFENDANT/COUNTER-CLAIM PLAINTIFF THOMAS TANASE, by counsel, brings this action against PLAINTIFF/COUNTER-CLAIM DEFENDANTS AMF BOWLING CENTERS, INC., BOWLERO, CORP. and against COUNTER-CLAIM DEFENDANT BRETT PARKER, whom DEFENDANT/COUNTER-CLAIM PLAINTIFF THOMAS TANASE will ask this Honorable Court to join as a party, for extortion in violation of Code of Virginia, 1950, as amended, § 18.2-59, and retaliation for asserting rights under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U. S. C. § 621 *et seq* ("ADEA").

### JURISDICTION

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, federal question, 29 U. S. C. § 626(c), and 28 U. S. C. § 1367, supplemental jurisdiction.

### VENUE

2. Venue is appropriate in this district under 28 U.S.C. § 1391(b).

### PARTIES

3. Counterclaim-Plaintiff, Thomas Tanase, ("Tanase") was formerly employed by the Counterclaim-Defendant   Bowlero Corp. for over 20 years in various positions involving the implementation and management of the technology used by the Plaintiff to operate its 300+ bowling centers nationwide, until he was unlawful terminated from his employment on May 16, 2023, while at that time serving as Chief Information Officer.

4. Counterclaim-Defendant AMF Bowling Centers, Inc. ("AMF"), a wholly owned subsidiary of Counterclaim-Defendant Bowlero Corp., is a Virginia corporation with its principal place of business in Mechanicsville, Virginia.

5. Counterclaim-Defendant, Bowlero is a Delaware corporation headquartered in Mechanicsville, Virginia ("Bowlero").

6. The Counterclaim Defendant, Brett Parker ("Parker") was at all times relevant to the counterclaims filed herein as a director and Chief Financial Officer of the Plaintiff and now currently serves as a director and Vice Chairman of the Plaintiff.

7. In doing the things alleged herein, Defendants and each of them acted jointly and severally and as agents of each of the other Defendants.

**Facts Relevant to the Counterclaims**

8. Bowlero started as a small bowling center chain with fewer than 10 centers led by its current CEO Tom Shannon ("Shannon").

9. Bowlero bowling centers adopted a different manner of business with reliance on 'open bowling'  and making its bowling centers places of entertainment versus traditional bowling centers catering mostly to league bowlers engaged in the sport of bowling and team play.

10. In or about 2013, AMF, the largest operator of bowling centers in the United States, having over 350 bowling centers nationwide, filed for bankruptcy.

11. On or about, July, 2013 Bowlero purchased all the bowling centers operated by AMF.

12. On or about October, 2014, Bowlero purchased Brunswick which was then the second largest owner of bowling centers having nearly 80 bowling centers nationwide.

13. Once AMF and Brunswick were acquired, Shannon set out on a national plan to transform many of the newly-acquired bowling centers from league bowling to versions of his Bowlero bowling centers that catered to younger people seeking a new form of entertainment with upgraded food and beverage offerings, new lighting, arcade games and with a much younger, "hip"- looking, attractive staff running the bowling centers, including management and food & beverage positions.

14. To achieve its business goals Shannon engaged in a nationwide plan to remove all older persons from the day-to-day operations of the bowling centers and in doing so removed and replaced nearly 75% of its managers and an undetermined number of food and beverage employees working as bartenders, waiters and waitresses that are estimated to be in the hundreds.

15. Bowlero, at the direction of Shannon, also changed its recruiting policies to deter older persons from gaining employment by requiring applicants to furnish their high school graduation date even demanding photographs to assess a candidate's appearance and it scheduling routine 'beauty contest' interviews on Skype with Shannon, even for low-ranking positions.  These interviews lasted just minutes providing a quick means for Shannon to gauge a person's appearance and age.

16. Bowlero also used recruiters which were given set parameters to screen applicants before they were offered to Bowlero for review to further insulate the company from hiring older workers.

17. Commencing in 2016, pursuant to the ADEA, former Bowlero employees all over the protected age class of 40 years or above through their attorneys, Dowe Partners LLC ("Dowe") filed Charges of Discrimination (COD's) against Bowlero with the Equal Employment Opportunity Commission ("EEOC") citing age as the basis for their termination.

18. The rapid accumulation of COD's resulted in the EEOC treating the COD's **as a systemic case**, which is akin to a 'class action' at the administrative level that led to Seventy-Eight (78) filed COD's with claimants residing nationwide as the course of conduct to rid bowling centers of older persons was rampant ("1st EEOC Investigation").

19. To date the EEOC has issued Fifty-Eight (58) separate Determinations of Liability ("DOL") finding probable cause that Bowlero indeed violated the ADEA in the 1st EEOC Investigation.

20. Not one COD has been adjudicated in Bowlero's favor.

21. Nineteen (19) CODs remain undecided.

22. The accumulation of evidence in the 1st EEOC Investigation demonstrated such a clear pattern and practice of discrimination nationwide that the EEOC, *sua sponte*, commenced a second independent investigation called a "Directed Investigation" to cover all unnamed, unknown persons that could have been injured by Bowlero's discriminatory conduct ("2nd EEOC Investigation").

23. For the CODs filed in the 1st EEOC Investigation: the average age of the former Bowlero employee was Fifty-Four (54); the average years of service was Seventeen (17); and, the average annual salary was $79,000.

24. The 1st EEOC Investigation involved persons residing in 18 different states.

25. The statistical evidence before the EEOC demonstrated the persons filing CODs against Bowlero, who had worked successfully in leadership positions for nearly two decades before being summarily and unlawfully dismissed because of their age.

26. The EEOC sought to enter the statutory settlement process called Conciliation to resolve the 1st EEOC Investigation and 2nd EEOC Investigation for an unprecedented settlement demand of Sixty Million dollars ($60,000,000.00) for age discrimination, with actual damages in the 1st EEOC Investigation now surpassing Eighty Million dollars ($80,000,000.00).

27. Conciliation ended due to Bowlero's refusal to admit to the findings of the 1st and 2nd EEOC Investigations and its inability to fund the Sixty Million dollars ($60,000,000.00) in damages assessed by the EEOC.

28. Other than personnel directly working under his supervision, Tanase was not involved in employment decisions at Bowlero and never once was a part of the changes made by management.

29. Nonetheless, Tanase due to his position as CIO had access to corporate and personal information and his role as CIO afforded him the highest level of clearance on all internal information, including information that motivated Counter-Defendant to extort and to retaliate against Tanase.

30. Bowlero's motivation resulted not only in the conduct described herein, but also the filing of the lawsuit in this case.

31. As a result of the actions of Counter-Defendants, jointly and severally, Tanase was required to and did hire an attorney to represent him in the amount of One Hundred Sixty-Five Thousand and 00/100 dollars ($165,000.00), to date.  Said expense is continuing.

32. As a result of the actions of Counter-Defendants, jointly and severally, Tanase, prior to the filing of this action, incurred other legal costs in the amount of Fourteen Thousand and 00/100 dollars ($14,000.00).

33. As a result of the actions of Counter-Defendants, jointly and severally, Tanase has suffered depression and anxiety for which he has received and continues to receive medical care, including, but not limited to, treatment by his physician and medication;

34. To date, these medical expenses have included twelve (12) doctor's visits per year at Four Hundred Fifty and 00/100 dollars ($450.00) per visit and medications at Four Hundred Seventy-Five and 00/100 dollars ($475.00) per month.  It is anticipated that this will continue and will increase, as his physician has suggested, for several years.

35. Each year, while working for Bowlero, Tanase would receive a pay increase that averaged Three percent (3%) per year;

36. In his last year, Tanase's salary was Two Hundred Sixty-One Thousand, One Hundred Thirty-Two and 82/100 dollars ($261,132.82).

37. At the time of his termination Tanase was sixty-one (61) years old and he had planned to work for Bowlero until age Sixty-Seven (67).

38. As a result of the actions of Counter-Defendants, jointly and severally, Tanase has lost and will lose One Million Nine Hundred Thousand Thirteen Thousand and 00/100 dollars ($1,913,000.00) in salary.  Additionally, Tanase received annual bonuses.  These bonuses averaged approximately Eighty Thousand and 00/100 dollars ($80,000.00) for the period described above;

39. As a result of the actions of Counter-Defendants, jointly and severally, Tanase has been unable to obtain similar employment and has been unemployed.

40. As a result of the actions of Counter-Defendants, jointly and severally, Tanase has suffered and continues to suffer mental anguish, embarrassment and humiliation, nightmares, fear, anxiety, loss of security, loss of the enjoyment of life, and damage to his reputation.  Financially, Tanase has had to deplete his 401K and has struggled maintaining his mortgage and meeting other expenses, has had difficulty financing his childrens' college educations, all of which has caused further stress;

## FIRST COUNTERCLAIM

### (Extortion)

41. Tanase repeats, reiterates and realleges each and every allegation contained in paragraphs 1 to 40 as though fully set forth *in haec verba*.

42. From early 2023 to his termination on May 16, 2023, Tanase suspected that he was being set up for termination via a practice that Bowlero undertakes to 'manage out' an employee.

43. "Managing-out" involves Bowlero's senior management engagement in routine harassment through closer supervision and scrutiny to seek purported "justifications" to discharge a person whose termination was in fact based upon discrimination.

44. A factual finding by the EEOC specifically cited in the DOL issued in Tanase's favor was that he was unlawfully terminated by the practice of 'managing-out' and that Bolero employee "[Lev] Eckster's conduct toward Charging Party (Tanase) included unwarranted hostilities, frequent criticism, unnecessary correction of his work, and undermining his authority and role vis-à-vis subordinates and vendors." (EEOC DOL for Tanase, EXHIBIT #1)

45. Due to the managing out process, , Tanase also began to visit a physician to address the intense anxiety he was experiencing knowing that his livelihood after the 20+ years of service to Bowlero could be in jeopardy with him having a young family to support.

46. On May 16, 2023 Tanase was terminated from his employment.

47. Upon being terminated from his employment, Bowlero sent Tanase a Termination Agreement. The Termination Agreement offered a paltry sum of money representing less than three (3) months of compensation after working for Bowlero for 20+ years in exchange for which Tanase would waive his legal rights to pursue all remedies available to him including, but not limited to, filing a claim with the EEOC, or speaking with Dowe.

48. Tanase refused the Termination Agreement.

49. Although Tanase  suspected for several months that his employment might be in jeopardy, at no time did he seek to secure confidential information, remove property, or engage in any other self-serving conduct while having full access to Bowlero's offices, office files, and computer servers.

50. It should be noted that Plaintiffs/Counter-Defendants make no allegations that Tanase took any confidential information while he was being managed out, nor do they identify any specific information Tanase obtained after termination, because at no time did Tanase take any such information..

51. The Counter-Defendants were and continue to be concerned that Tanase would be an important witness to the EEOC and were particularly concerned that Tanase would join the claimants in the 1st EEOC Investigation by filing his own COD and sharing information about Bowlero with the EEOC, Dowe and national news outlet CNBC.

52. Counter-Defendants desperately needed to silence Tanase.

53. Counter-Defendants were upset about the negative information CNBC had published (See Exhibit #2 - CNBC Article**),** and were concerned that Tanase would reveal even more damaging information.

Parker, on behalf of himself and the other Counter-Defendants, contacted Tanase on several occasions after he was terminated During several taped telephone calls, Parker threatened that he would contact the FBI and local authorities and made sweeping, unfounded allegations of computer hacking unless Tanase agreed to refrain from contacting the EEOC, Dowe or CNBC and unless Tanase sign a termination agreement.

54. These threats constituted extortion defined in Code of Virginia, 1950, as amended § 18.2-59.  (A transcript of the taped conversation is attached hereto as Exhibit 3).

55. Said Exhibit confirms Parker, on behalf of himself and the other Counter-Defendants, intended to scare Tanase to be concerned about his personal and professional reputation by threatening to report to federal and local authorities a "crime" lacking

any factual basis unless Tanase relinquished <u>his</u> valuable legal rights to challenge his termination before the EEOC or in court.

56. After having threatened Tanase with extortion regarding fabricated allegations of computer tampering, Counter-Defendants, jointly and severally advised Tanase that they were willing to walk away from making the false claims that are the basis of the lawsuit in this case if Tanase waived his rights, including his EEOC rights.

57. Counter-Defendants, jointly and severally, continually used the fabricated allegations to bludgeon Tanase to forgo his legitimate claims.

58. That conduct, which is the basis of the Complaint in this case, is fabricated and is of no concern to the Plaintiffs as established by the willingness of the Plaintiff/Counter-Defendants to walk away from any of the alleged conduct, if Tanase 'played-ball' and gave up his legal rights to file a COD with the EEOC, and refrained from contacting Dowe or CNBC, and refrained from telling the truth to the EEOC on behalf of others.

59. As a result of the actions of Counter-Defendants as described in this cause of action, Tanase suffered the injuries and damages described in paragraphs 31 to 40, inclusive, *supra*.

60. In doing the things alleged herein, Counter-Defendants acted willfully, wantonly, intentionally, maliciously, fraudulently, and/or in conscious disregard of Tanase's rights; said conduct justifies the award of punitive damages.

WHEREFORE, plaintiff prays that this Court order the following relief on the first counterclaim:

a. General compensatory damages in the amount of Five Million and 00/100 dollars ($5,000,000.00).

b. Attorney fees and other legal expenses incurred to date in the amount of One Hundred Sixty-Five Thousand and 00/100 dollars ($165,000.00), and continuing in the future in an amount according to proof.

c. Medical expenses of in the amount of Five Thousand and 00/100 dollars ($5,500.00) and continuing in the future in an amount according to proof.

d. Loss of past and future salary in the amount of One Million Nine Hundred Thousand Thirteen Thousand and 00/100 dollars ($1,913,000.00) and continuing in the future in an amount according to proof

e. Loss of bonuses past and future in the amount of Five Hundred Sixty Thousand and 00/100 dollars ($560,000.00) and continuing in the future in an amount according to proof

f. Other special damages according to proof;

g. Punitive damages in the amount of Three Hundred Fifty Thousand and 00/100 dollars ($350,000,00);

h. Interest at the legal rate from the date of the arrest;

i. Costs of suit herein, and/or

j. Such other and further relief as the Court may deem just and proper.

## SECOND COUNTERCLAIM

### (Retaliation)

67. Tanase incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba*.

68. On or about June 15, 2023, Tanase deemed any further communications with Counter-Defendants to be futile and terminated further communications.

69. Shortly thereafter, Tanase contacted Dowe to represent his interests before the EEOC which Counter-Defendants learned of through their counsel.

70. On July 12, 2023 Plaintiffs filed this action as a materially adverse act against Tanase to deter him from, *inter alia*, filing a COD with the EEOC, or serving as a critical witness for the EEOC's investigations.

71. On August 20, 2023, Dowe on behalf of Tanase filed a COD against the Counter-Claim Defendants at the EEOC based on age discrimination making Tanase the 74th client represented by Dowe at the EEOC. (Tanase COD – Exhibit 4)

72. The ADEA protects all persons of the age of 40 or older from discrimination in the workplace based on age. At the time he filed his claim, Tanase was 61 years old and was terminated because of his age and replaced by a much younger person, as was the case in the COD's filed at the EEOC on behalf of 77 other former employees of Bowlero.

73. Bowlero's decision to terminate Tanase based on his age was the direct cause of the injuries he has sustained from his lost compensation and benefits, use of his savings to sustain himself, pecuniary losses associated with search of new employment, including paying for his own medical insurance and legal fees.

74. On February 28, 2024, the EEOC issued a DOL in favor of Tanase, reflecting that reasonable cause was found that Bowlero violated federal anti-discrimination laws based on age and took particular note of denying Bowlero's current CIO, Lev

Eckster's false claim that Tanase resigned when the evidence was unequivocal that Tanase had been terminated by Bowlero. (See Exhibit 1, supra 44)

75.  As in the instant case, Bowlero proffered false, misleading and malicious allegations into the EEOC proceeding claiming Tanase resigned when the surrounding facts could only result in one conclusion – that Bowlero terminated Tanase – and the EEOC made this clear to in its decision.

76. Tanase's DOL that was sent to Bowlero's counsel specifically states:

> **You are reminded that federal law prohibits retaliation against persons who have exercised <u>their right to inquire</u> or complain about matters they believe may violate the law.**

77. Plaintiffs/Counter-Defendants filing of this action, with knowledge there is no factual basis for the allegations made herein and with knowledge that Counter-Defendants, jointly and severally, were prepared to drop all claims against Tanase had he waived his legal rights to challenge Plaintiffs/Counter-Defendants and refrain from contacting Dowe, the EEOC and CNBC is a prima facie act of retaliation in violation of federal law.

78. This lawsuit is a case of retaliation against Tanase for exercising his legal rights under the ADEA.

79. As a result of the actions of Counter-Defendants as described in this cause of action, Tanase suffered the injuries and damages described in paragraphs 31 to 40, inclusive, *supra*.

80. In doing the things alleged herein, Counter-Defendants acted willfully, wantonly, intentionally, maliciously, fraudulently, and/or in conscious disregard of Tanase's rights; said conduct justifies the award of punitive damages.

WHEREFORE, plaintiff prays that this Court order the following relief on the first counterclaim:

a.    General compensatory damages in the amount of Five Million and 00/100 dollars ($5,000,000.00).

b.   Attorney fees and other legal expenses incurred to date in the amount of One Hundred Sixty-Five Thousand and 00/100 dollars ($165,000.00), and continuing in the future in an amount according to proof.

c.   Medical expenses of in the amount of Five Thousand and 00/100 dollars ($5,500.00) and continuing in the future in an amount according to proof.

d.   Loss of past and future salary in the amount of One Million Nine Hundred Thousand Thirteen Thousand and 00/100 dollars ($1,913,000.00) and continuing in the future in an amount according to proof

e.   Loss of bonuses past and future in the amount of Five Hundred Sixty Thousand and 00/100 dollars ($560,000.00) and continuing in the future in an amount according to proof

f.   Other special damages according to proof;

g.   Punitive damages in the amount of Twenty Million and 00/100 dollars ($20,000,000,00);

h.   Interest at the legal rate from the date of the arrest;

i.   Costs of suit herein, and/or

j.   Such other and further relief as the Court may deem just and proper.


                                              Respectfully submitted,

Thomas Tanase
By Counsel

*//I.Scott Pickus*
I. Scott Pickus, Esquire
VSB # 24564
10132 West Broad Street
Glen Allen, VA 23060

(804) 377-6688 voice
(804) 334-6964 cell
(206) 203-2766 fax
spickus1@comcast.net

*/s/Alan J. Cilman*
Alan J. Cilman
VSB #13066
Counsel for Defendant
10474 Armstrong Street
Fairfax, VA 22030
Telephone: (703) 261-6226
Facsimile: (703) 268-5182
acilman@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of April, 2024 I will electronically file the foregoing

Counterclaim  with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to the following:


Randy C. Sparks, Jr.
Catrina C. Waltz
Neil Shantaram Talegaonkar
KAUFMAN & CANOLES, P.C.
1021 East Cary Street, Suite 1400
Richmond, VA 23219
rcsparks@kaufcan.com
ccwaltz@kaufcan.com
nstalegaonkar@kaufcan.com


Alexander Benjamin Spiro
Daniel Sisgoreo

Hope Delaney Skibitsky
QUINN EMANUEL URQUHART & SULLIVAN, LLP (NY-NA)
51 Madison Ave 22nd Floor New York, NY 10010
alexspiro@quinnemanuel.com
danielsisgoreo@quinnemanuel.com
hopeskibitsky@quinnemanuel.com

Asher Griffin
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
ashergriffin@quinnemanuel.com

Michael Edmund Shaheen
QUINN EMANUEL URQUHART & SULLIVAN, LLP (DC-NA)
1300 I Street NW Suite 900
Washington, DC 20005
michaelshaheen@quinnemanuel.com

                                        */s/  I.  Scott Pickus*
                                        I. Scott Pickus, Esquire
                                        VSB # 24564
                                        10132 West Broad Street
                                        Glen Allen, VA 23060

                                        (804) 377-6688 voice
                                        (804) 334-6964 cell
                                        (206) 203-2766 fax

                                        spickus1@comcast.net



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Baltimore Field Office**

G. H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201
National Contact Center: (800) 669-4000
National Contact Center TTY: (800) 669-6820
Baltimore Status Line: (866) 408-8075
Baltimore Direct Dial: (410) 801-6685
TTY (410) 962-6065
FAX (443) 992-7880

Charge No. 531-2023-04251

Thomas Tanase                                          Charging Party
7991 Kenmore Drive
Mechanicsville, VA 23111

Bowlero Corporation (charged as AMF Bowling Centers, Inc.)     Respondent
222 W. 44th St.
New York, NY 10036

## DETERMINATION

Under the authority vested in me by the Commission's procedural regulations, I issue the following determination on the merits of this Charge. Respondent is an employer within the meaning of the Age Discrimination in Employment Act of 1967, as amended ("ADEA"). All requirements for coverage have been met.

Charging Party alleges that he was discharged due to his age (61) in violation of the ADEA.

Respondent denies all allegations and contends Charging Party resigned and was not discharged.

An examination of the evidence in this matter demonstrates the following facts:

Charging Party was 61 years-old immediately prior to the end of his employment by Respondent.

On or about May 16, 2023, Charging Party received a call from Respondent's human resources staff stating that the company accepted his resignation, which he had allegedly tendered after a significant disagreement with his direct supervisor, Lev Eckster. However, at no time did Charging Party intend to resign, nor would his statements or actions be viewed by a reasonable person as indicating an objective intent to resign. In fact, Charging Party was working when notified that his resignation had been accepted, and Respondent disregarded his express denial of any intent to resign. Notwithstanding these facts, Respondent persisted in terminating Charging Party, mischaracterizing his disagreement with his supervisor as a pretextual justification for falsely asserting that he had resigned and then discharged him from his employment.

In that regard, Respondent has maintained a practice of "managing out" older workers, wherein Respondent officials harass and closely scrutinize such workers looking for purported justifications to discharge them. That practice was applied to Charging Party. Eckster's conduct toward Charging Party included unwarranted hostility, frequent criticism, unnecessary correction of his work, and undermining his authority and role vis-a-vis subordinates and vendors.

Determination Continued
EEOC Charge No.: 531-2023-04251
Page 2

The foregoing Respondent actions took place in a context of pervasive age bias toward older workers. For instance, Respondent officials with direct or successively higher supervisory authority over Charging Party and Eckster frequently made age-biased remarks about older workers and stated a desire to hire younger workers, and Respondent has exhibited a pattern of discharging older workers because of age.

Respondent's assertion that Charging Party resigned is a pretext for discharge because of age.

Based on the foregoing, I find that there is reasonable cause to believe that Respondent subjected Charging Party to discharge because of his age (61) in violation of the ADEA.

Upon finding reasonable cause that unlawful employment practices have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Conciliation is Respondent's opportunity to voluntarily remedy the unlawful employment practices found to have occurred. Ultimately, any conciliation agreement must be acceptable to the Commission. Forthcoming under separate cover will be a conciliation proposal designed to remedy the unlawful employment practices found to have occurred in this Determination. Respondent is invited to respond to this proposal within fourteen (14) days of receipt.

If Respondent fails to engage in conciliation, or if the Commission determines, in its sole discretion, that the agency's conciliation attempt has been unsuccessful, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

You are reminded that federal law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in Commission investigations is also prohibited. These protections apply regardless of the Commission's determination on the merits of the Charge.

ON BEHALF OF THE COMMISSION:

02-28-2024
_____
Date

_____
Rosemarie Rhodes
Director

cc:   Alex Spiro                          Daniel Dowe, Esq.
      Quinn Emanuel                       Dowe Partners, LLC
      51 Madison Avenue, 22nd Floor       42 Forest Lane

Determination Continued
EEOC Charge No.: 531-2023-04251
Page 3

New York, NY 10010                    Bronxville, NY 10708

Exhibit 2 to Proposed Counterclaim

# Bowlero, the public company that reimagined bowling, faces dozens of discrimination claims that the feds want to settle for $60 million

*Gabrielle Fonrouge*



[Bowlero](#), the buzzy bowling company that was one of the few successful stocks to emerge from the SPAC boom, is the subject of a sprawling federal investigation into age discrimination and retaliation that authorities now want to settle for $60 million, CNBC has learned.

Negotiations over the settlement, proposed by the U.S. Equal Employment Opportunity Commission in early January, failed in April and the case is being referred to the EEOC's general counsel "for potential enforcement action," a letter sent by the EEOC shows.

If the EEOC decides to sue and if it prevails in court, the company could face even steeper fines, experts said.

Before the agency can sue Bowlero in federal court, the EEOC's commissioners need to vote on the matter.

The $60 million resolution proposal has not yet been publicly disclosed and was revealed to CNBC by

attorney Daniel Dowe, who represents more than 70 former employees with claims against Bowlero. The EEOC briefed him about the settlement proposal so he could obtain authorization from his clients before agreeing to settle, he said.

The EEOC's probe into Bowlero, the world's largest owner and operator of bowling centers, is wide-ranging and has been ongoing since 2016, company filings with the Securities and Exchange Commission show. It involves at least 73 former employees who claim they were fired based on their age, or out of retaliation, according to the filings.

The company disclosed in the filings that EEOC's investigation resulted in a determination of reasonable cause that Bowlero has been engaging in a "pattern or practice" — a term that indicates systemic issues — of age discrimination since at least 2013, which Bowlero denies.

The agency typically finds reasonable cause in only a small fraction of cases each year, EEOC data shows.

Experts say the settlement proposal is particularly large for the agency, especially when compared with the monetary benefits the EEOC secured for victims of age discrimination in previous years.

The company has repeatedly denied allegations of discrimination and other wrongdoing.

If Bowlero — which went public in late 2021 through a special purpose acquisition company, or SPAC — ends up settling the case or losing in court, it won't be a major blow to the company's balance sheet or operations now, experts said. But the indirect costs could plague Bowlero well into the future, they said.

Following the publication of this report, Bowlero's intraday losses accelerated, and the stock dropped as much as 9% Thursday afternoon. Shares closed about 4% lower.

A Bowlero location at Chelsea Piers in New York City.

CNBC

Bowlero CEO Thomas Shannon is accused of hosting "obvious beauty contests" with prospective hires over brief video calls to evaluate a candidate's appearance as part of the hiring process, according to a complaint filed by a former employee and a sworn affidavit filed by another staffer to the EEOC.

At times, Shannon even screened candidates for lower-level, customer-facing roles at the company, which had nearly 10,000 employees across more than 300 bowling centers as of July, documents filed by former employees say. Shannon directed staff to replace aging employees with candidates perceived as young, hip and attractive, documents say.

CNBC sent a detailed message to Bowlero outlining the allegations of discrimination and retaliation made to the EEOC included in this story. When asked for comment, the company's lawyers sent the

same response for each: "This is a meritless claim."

"Defamatory statements about Mr. Shannon will not be taken lightly," the attorneys warned.

The 73 EEOC claims brought by individual former employees against the company sparked the larger pattern or practice investigation into age discrimination.

The EEOC has found reasonable cause in 55 of the cases and in the pattern or practice probe, Bowlero has said in filings. The other 18 individual claims remain under investigation, according to a February filing.

Only a fraction of EEOC age discrimination complaints — 2.8% in fiscal 2021 — resulted in reasonable cause determinations, EEOC data show.

Robert Levy, an employment law attorney who has filed hundreds of EEOC claims on behalf of his clients over the last 20 years, said he was struck by the number of reasonable cause determinations the EEOC made in the complaints against Bowlero.

"It's sort of the difference between the organism being sort of rotten to the bone and, you know, a piece of a large organization maybe having some bad actors who handled a individual situation poorly or unlawfully," Levy, who is not involved with the Bowlero case, told CNBC.

"I think it cuts right to the heart of the way a company is alleged to be doing business," he said.

Levy added that the findings raise concerns about "institutional disregard for the anti-discrimination laws."

The EEOC is responsible for enforcing federal laws that make it illegal to discriminate against a job applicant or an employee because of the person's race, color, religion, sex, gender identity, sexual orientation, national origin, age, disability or genetic information.

When people face such discrimination in the workplace, they can file complaints with the EEOC, which has the authority to investigate the charges and works to settle the cases with employers.

When settlement negotiations with the EEOC fail, the agency can decide to file suit against the company. If it chooses not to file suit, the victim can typically pursue their own private lawsuit.

The EEOC declined to comment, citing federal law.

In filings, Bowlero informed investors about the reasonable cause determinations and said the company "contests such determination and intends to defend vigorously."

While the proposed $60 million settlement with Bowlero was just a proposal, the number stands out when compared with other claims the EEOC has successfully settled out of court.

EEOC data from fiscal 2021, the most recent available, shows the agency secured a total of $83.8

million in monetary benefits for victims of age discrimination across hundreds of cases over that entire year.

## 'Fresh young faces' to fuel a growth boom

In mid-February, Bowlero wowed investors when it announced what it called a [record-breaking $273.4 million in sales](#) in the three months that ended Jan. 1 — a 33.2% year-over-year increase. It posted a net income of $1.4 million.

A little over a month before its second-quarter earnings report was released, Bowlero announced its trailing 12-month revenue [had topped $1 billion](#) and its same-store sales had grown about 48% in the period.

The stock, which started trading around $10 a share in December 2021, has climbed as high as $17 a share this year. It is now trading around $13 a share with a market cap of about $2.2 billion.

Bowlero's ascent to becoming a profitable public company, which has caught the attention of big bank analysts and even CNBC's [Jim Cramer](#), started some 26 years ago in a rundown bowling alley in downtown Manhattan.

In 1997, Shannon was in his early 30s and living in New York City when he attended a party at a Union Square bowling alley and immediately saw potential in the pins and smoke-stained walls, he has said.

"It was the very traditional, warm beer, cold food, smelly bathroom, scary person on the lane next to you bowling center," Bowlero Chief Financial Officer and President Brett Parker said during a presentation at the Raymond James Institutional Investors conference in March. Parker is leaving his role as the company's chief financial officer later in May to focus on what Shannon called "strategic relationships," the company announced Tuesday. Parker will remain as vice chairman of the board and president.

"But thank you to Tom, because he had the vision to see that and know that it could and should be something more," Parker said.

The Bowlero location at Chelsea Piers in New York City.

CNBC

With a $3,000 cash down payment and "$2 million borrowed," Shannon [bought the bowling alley](#) and transformed it from a "dingy" hole in the wall to an "upmarket experience" with elevated food and drink offerings, sleek renovations and world-class customer service, the company has said.

Shannon would spend the next two decades [replicating that model](#) in tired bowling alleys across America and building an empire that embodied his vision of cool.

The company reached a turning point in 2013. It went from running six bowling alleys to 272 overnight after it acquired AMF, which was then the largest bowling company in the world and was in bankruptcy.

The following year, Shannon's company acquired the Brunswick Corporation, the second-largest bowling company in the world, and changed his company's name to Bowlero.

As aging alleys across the country began to get the Bowlero makeover, another part of the plan was unfolding behind closed doors, former employees say. Not only did the centers need a refresh, but Shannon determined its staff did as well, according to complaints filed to the EEOC.

Between 2013 and 2015, at least 287 managers from 351 bowling centers were fired, according to employment data filed to the EEOC compiled by Dowe from former employees.

Senior managers who survived the purge told the EEOC they were pressured to replace longtime staffers because "they were too old" and the company wanted "fresh young faces," according to an affidavit filed by a former employee.

Customers arrive at a Bowlero location in Eden Prairie, Minnesota, March 18, 2017.

Andy King | Getty Images Entertainment | Getty Images

One top-performing employee in his mid-50s was fired "shortly after being stricken with a medical condition that caused his face to become disfigured," a former member of the human resources team told the EEOC in a sworn affidavit.

Among staff, the top executive was also known to make condescending jokes about women, off-handed remarks that were "racially motivated" and negative comments about LGBTQ people, the affidavit says. Some female employees didn't openly disclose their marital status or their pregnancies out of fear of losing their jobs, the former HR employee told the EEOC.

"It was well-known within the company that motherhood is the end of your career at the company if you work for Shannon," said the employee. "Pregnancy was totally against Shannon's practices of having attractive, sexually appealing persons at the forefront of his company, regardless of merit and competence."

The employee recalled an instance where a "highly-qualified pregnant woman ... was denied future opportunities because she 'was showing.'"

Bowlero called all of those allegations "meritless."

In March 2022, the EEOC made its finding of reasonable cause that Bowlero has been engaging in a pattern or practice of age-related discrimination since 2013, which coincides with the company's acquisition of AMF and its expansion, securities filings show.

## Bowlero goes public

In July 2021 — nearly five years into the EEOC's investigation into Bowlero — the company announced it would merge with Cayman Islands-based blank check company Isos Acquisition Corporation and go public at a valuation of $2.6 billion.

The SPAC's two CEOs were George Barrios and Michelle Wilson, who served as co-presidents of WWE until their departure from the company in January 2020. They are now back at the wrestling giant.

Bowlero CEO Thomas Shannon, center, at the New York Stock Exchange, Dec. 16, 2021.

Source: NYSE

In its first S-4, filed to the SEC on July 21, 2021, Bowlero said, "there are currently a number of claims and legal proceedings pending against us." It noted any potential liabilities were "not expected to have a material effect on our consolidated financial condition, results of operations or cash flows." But Bowlero did not disclose the scope of the EEOC's probe.

The company used the same language under the heading "legal proceedings" in its next three amended S-4s until it received a letter from the SEC asking about the EEOC probe.

"We are aware that certain former employees of Bowlero have filed charges with the U.S. Equal Employment Opportunity Commission alleging certain unlawful employment practices and discrimination," says the SEC's letter, dated Nov. 5, 2021. "Please advise what consideration you have given to disclosing these charges pursuant to Item 103 of Regulation S-K."

Three days later, the company filed another amended S-4 and disclosed the scope of the EEOC's probe. Bowlero reiterated in the edited filing that it did not expect the probe to have a "material effect" on its financial health.

The filing said that "management believes such claims to be in the ordinary course and without substantive merit."

The SEC flagged the omission before Bowlero's stock started trading, and correspondence with the agency is a routine part of the process. Still, experts questioned why the investigation was not disclosed at first.

"If the EEOC was investigating you, why didn't you disclose this initially?" said Anthony Sabino, a longtime business attorney and law professor at The Peter J. Tobin College of Business at St. John's University.

"Why did it take four tries?" he asked. "The bottom line is, it's got to be disclosed."

Bowlero, through attorneys, said it did not withhold material information at the time.

"The Company believed in 2021 and continues to believe that the EEOC claims at issue are without merit, is defending the claims aggressively and is confident that it will prevail," the company's lawyers said.

The attorneys said "there was no need" to disclose the probe when Bowlero went public, but the company later did so and has "updated its disclosures as appropriate since its IPO."

## Preplanned stock sales

In the midst of Bowlero's settlement negotiations with the EEOC, which began Aug. 22, 2022, and failed in April, Shannon entered into a prescheduled trading plan, or a 10b5-1, to sell some of his holdings, filings show.

Between Jan. 6 and March 3, Shannon sold 2.4 million shares of his stock for about $35 million, securities filings show. The shares represent a fraction of Shannon's overall holdings and the sales didn't affect his over 80% voting power, which largely comes from his holdings in "super voting shares" of class B common stock.

Bowlero's lawyers said the timing of the stock sales was set in November 2022 and that Shannon entered into the plan "at a time when he had no material non-public information about the company." They added he "had no discretion over the timing or magnitude of sales" once the plan was established.

In December, the EEOC made 42 more reasonable cause determinations after the stock sale plan was enacted. Bowlero did not disclose the update until it filed a quarterly report on Feb. 15.

The Bowlero location at Chelsea Piers in New York City.

CNBC

The company's lawyers said that although "disclosure of the additional [reasonable] cause filings may not have been required, [Bowlero] elected to do so in its quarterly filings—precisely as is contemplated by the securities laws. [Bowlero] has been, and will continue to be, in full compliance with its disclosure requirements."

There is no evidence that Bowlero broke federal law in regard to its disclosures, experts said.

Most executives receive stock as part of their compensation and the plans are a way for them to safely sell those holdings without spooking shareholders or arousing suspicion that they are engaging in insider trading.

They serve an important purpose, because without them, executives could face liability for selling their holdings, which they are entitled to do.

However, in general, 10b5-1 plans have also come under criticism for the shield they could provide to executives — and how the plans could allow them to time the release of positive or negative information.

For example, executives could wait to disclose negative information until after sales from a 10b5-1 are complete, to avoid a drop in the stock price, experts said. They may also release positive information prior to the start of the sale plan so they can benefit from any boost in the share price, according to experts.

In a December 2020 white paper, Joshua Mitts, a law professor at Columbia University and one of the leading experts on securities laws and 10b5-1 plans, found that public companies disproportionately disclose positive news on days when executives sell shares under predetermined 10b5-1 plans.

## Failed negotiations, court battle could come

In an April 11 letter sent by the EEOC to Bowlero and the plaintiffs' attorney Dowe, the agency said efforts to settle the allegations had been "unsuccessful" and the matter was being referred to the EEOC's Office of General Counsel "for potential enforcement action."

Dowe said negotiations fell apart when Bowlero countered the EEOC's $60 million settlement proposal with a proposal of $500,000.

Patrick Boyd, a labor and employment law attorney with The Boyd Law Group, said Bowlero could benefit from fighting the case in court, if the EEOC sues.

"They get a chance to really scrutinize the individual plaintiffs and the claims that they have and maybe lop off some of the claims or scare some plaintiffs away," Boyd said.

On the other hand, it can be very "advantageous" for discrimination victims if the EEOC decides to prosecute their case and it could result in higher settlements, said Levy, the employment law attorney who has worked on EEOC claims.

In Levy's experience, settlements obtained through litigation tend to be higher than the amounts decided on during EEOC mediation, he said. Further, victims' damages and attorneys fees accrue more the longer the case goes on, which also contribute to higher settlements, he said.

The Bowlero location at Chelsea Piers in New York City.

CNBC

Regardless, Bowlero appears to be well-situated to pay damages if it loses in court. Raphael Duguay, an assistant professor of accounting at Yale University's School of Management, reviewed Bowlero's balance sheet and said a multimillion-dollar settlement or verdict wouldn't have a major impact on its operations or cash flow and would represent a loss of only a few cents per share.

Analysts who cover the company agreed. They told CNBC they weren't concerned about the EEOC's probe or any potential settlements.

Steven Wieczynski, a managing director at Stifel who initiated coverage of Bowlero at a price target of $26 in late March, said he doesn't care about the ongoing EEOC case and its settlement proposal. He said if Bowlero was ordered to pay a settlement "it would have no impact" on his view of the company "even if they had to pay $100 million."

Still, Duguay said that the indirect costs of the EEOC's investigation, while hard to calculate, could be damaging in the long term and larger than the agency's proposed settlement given the rise in consumer activism.

"That indirect cost would take the form of reputational damage because there's public shaming; this comes out and then people don't go to their bowling alleys anymore, so they're losing a lot of revenue," Duguay said. "I think that's the key concern."

"If the EEOC conveys the message that Bowlero is a serious offender in terms of discrimination and lack of inclusion, the indirect effects of that can be very significant," Duguay said.

In response, Bowlero's attorneys reiterated that the company expects to withstand any outcome of the probe.

"Most importantly, the Company believes the EEOC claims are meritless and that it ultimately will prevail," the lawyers said. "Second, the Company has more than sufficient resources to resolve the matter if it chooses to do so."

*Disclosure: "Mad Money with Jim Cramer" airs on CNBC.*

6-17-2023.mp3

# Transcript

00:00:00 Brett Parker

If this is going to turn into a.

00:00:03 Brett Parker

Police, FBI level investigation and we're going to get to the answer.

00:00:10 Thomas Tanase

Brett, again, I'm telling you that I don't have his emails. If something is, if something was accessing it.

00:00:11 Brett Parker

And that's going to be the big.

00:00:12 Brett Parker

That would be.

00:00:14 Brett Parker

I'm not asking if you have his emails.  It's not that have.

00:00:17 Brett Parker

His emails. You were in his web mail every day since the end of your.

00:00:23 Brett Parker

Employment.

00:00:24 Brett Parker

Until yesterday, when you tried three times and couldn't get in because we changed the password.

00:00:28 Thomas Tanase

I've been out of Commission for a week.

00:00:35 Brett Parker

Tom.

00:00:35 Thomas Tanase

I've been in the hospital even.

00:00:39 Brett Parker

OK, honestly, if you come clean there is a path where you are our friend. Again. You tell us everything that's transpired. Hold on. Hold on. Just let me finish. You tell us everything you know about Dowe everything that's ever happened with respect to Dowe.

00:00:49 Thomas Tanase

Brett, Brett again.

00:00:59 Brett Parker

With respect to the CNBC and then there can be a number and there can be a go away and we can move on. But we have to get the truth and full clarity.

00:01:09 Thomas Tanase

Brett again, again.

00:01:12 Thomas Tanase

I have nothing from Dell but phone. I got some text messages and that's about it. Nothing's been passed along and I have no possession of anything.

00:01:22 Brett Parker

No, because you were using his Webmail.

00:01:24 Thomas Tanase

I wasn't using anything. I have nothing. There's been nothing downloaded.

00:01:30 Brett Parker

That that's those those that is not the Standard Tom. It is accessing the server.

00:01:33 Thomas Tanase

There there is. There is nothing. There is nothing for me to give you here.

00:01:40 Brett Parker

There is. There's the truth.

00:01:43 Thomas Tanase

I just told you the truth.

00:01:45 Brett Parker

Have you been in his Webmail, Tom?

00:01:47 Thomas Tanase

I haven't touched anything in his Webmail.

00:01:51 Brett Parker

Did you access?

00:01:52 Thomas Tanase

I might have someone might have logged in, it might have been my device. Who knows. I had it on my phone.

00:01:58 Brett Parker

Just get to the part where you tell the truth.

00:02:00 Thomas Tanase

Yeah. The truth is, the truth is, Brett, I don't access his web mail. I have nothing of his property. I have no emails of his.

00:02:10 Brett Parker

Well, I'm glad to hear you didn't.

00:02:11 Brett Parker

Download them but.

00:02:12 Thomas Tanase

I have no emails of his. I have nothing.

00:02:12 Brett Parker

Want you to tell me exactly.

00:02:16 Brett Parker

Tom, yes.

00:02:18 Brett Parker

Did you access his web mail after the end of your employment? Just tell me the truth.

00:02:22 Thomas Tanase

Not that. Not that I know of.

00:02:25 Brett Parker

Not that I know of.

00:02:25 Thomas Tanase

Not that I know of. I don't know what might have logged in with device. I might have had running.

00:02:34 Brett Parker

No device running with logging.

00:02:37 Thomas Tanase

This e-mail could have been on one of my devices. It could have been, it could have logged in, I'm not sure.

00:02:41 Brett Parker

No, no, no, no, no, no, no, no Webmail.

00:02:47 Brett Parker

You're.

00:02:49 Brett Parker

Telling me the truth is going.

00:02:50

To help you not hurt you.

00:02:51 Thomas Tanase

Brett I'm gonna repeat myself. I have nothing of Tom's. There is nothing for you to get. I do. It's in a bag at my front door. OK.

00:03:08 Brett Parker

Well first of all you do have things that belong to the company

00:03:10 Brett Parker

And you accessed his email. And and you may have not downloaded it. I mean you didn't and maybe you don't need to return it and that's fine. But we do need to understand the full scope of what actually happened and then we need to see all the stuff with Dowe and anything with CNBC and you can just you can.

00:03:29 Brett Parker

Fall back into our good graces and be our friend in this matter and you will get paid to do that, but it has to start with the truth.

00:03:39 Thomas Tanase

Alright, there's nothing for us to talk about. Call your FBI. I have nothing.

00:03:45 Brett Parker

I have nothing. It's not the same thing.

00:03:47 Thomas Tanase

Brett, I have nothing. I'm not talking about anything else.

00:03:51 Thomas Tanase

Like I said that there may be a device that may be an iPad. I don't know. You could go through them, but I haven't done anything illegal.

00:03:53

So.

00:04:02 Thomas Tanase

I haven't done anything malicious either. I haven't talked to anything or given out any information to anybody. I've told you this before.

00:04:11 Brett Parker

I know, but it's not this you you told other people different things that you told me in terms of how much, whether or not you spoke to Dowe and all.

00:04:26 Thomas Tanase

No, I didn't. I never did. I didn't even know who Dowe was three weeks ago. I asked Danielle, Danielle said their name and I said that's where I remember that name. She had mentioned them. I didn't know who they were. She mentioned them. I never reached out to Dowe. They reached out to me and it was only a few days ago. Couple days ago in fact. And that was it. But I did reach out to lawyers in DC.

00:04:46 Brett Parker

Yeah, I know, I heard that part.

00:04:47 Thomas Tanase

Yeah. But I'm not lying about that part. And that was it. I never talked to anybody from CNBC, no matter what anybody says I did.

00:04:57 Brett Parker

Absolutely, Tom, just so you know, I believe you.

00:05:01 Brett Parker

And I have been arguing internally that you have not done those things and that you won't do those things. The flying in the ointment was.

00:05:11 Brett Parker

This access problem.

00:05:15 Brett Parker

So I can still be in that place and we can still you can prove out that you didn't give anything to those people and you can just explain to us anything that happened. Any contacts from them, laying it all out.

00:05:32 Brett Parker

And then there we're going to.

00:05:36 Brett Parker

Give you a severance and move on, but you really don't want this to start with the police.

00:05:41 Thomas Tanase

But you could send the police. I don't know what to tell you.

00:05:49 Thomas Tanase

Sounds like someone's using my IP.

00:05:54 Thomas Tanase

I don't know Brett.

00:05:58 Thomas Tanase

I don't know Brett.

00:06:04 Brett Parker

I'm trying to help you here, Tom.

00:06:06 Thomas Tanase

And I'm and I'm trying to tell you, I've got nothing for you.

00:06:09 Thomas Tanase

Brett.

00:06:14 Brett Parker

I I just I I can't get past the.

00:06:18 Brett Parker

Factual, detailed reporting of you're accessing his e-mail.

00:06:24 Thomas Tanase

I'm not sure what you have, but IP address knocking on a door I get it.

00:06:30 Brett Parker

Same IP address that you've used that it's your IP address.

00:06:35 Thomas Tanase

Could be.

00:06:37 Thomas Tanase

It won't be the last time somebody does that.

00:06:41 Brett Parker

Well, well, because.

00:06:43 Brett Parker

His passwords changed and his two factors turned on.

00:06:46 Thomas Tanase

OK.

00:06:51 Brett Parker

Good.

00:07:02 Brett Parker

So. So you're just that that's you're going to stick with?

00:07:07 Brett Parker

You haven't accessed it.

00:07:09 Thomas Tanase

I haven't accessed it. I I again, I don't know if there's a device.

00:07:14 Thomas Tanase

That's trying to could be I'll look.

00:07:19 Brett Parker

But it's not that kind of thing, because it's not like it's knocking every 5 minutes, it's like.

00:07:26 Brett Parker

Going into the e-mail several times a day.

00:07:30 Thomas Tanase

Yeah, not me.

00:07:32 Brett Parker

And then.

00:07:35 Brett Parker

Tom, here's the problem. If you admit it, you don't have a problem because we can work this out. If you don't, I'm not going to be able to fight this internally, and you're going to be trying to explain to the FBI that some device did this and I don't want you to be in that position.

00:07:55 Brett Parker

I really don't.

00:08:01 Brett Parker

You gotta help me help you.

00:08:09 Brett Parker

You want to think about it.

00:08:11 Thomas Tanase

Sure.

00:08:13 Brett Parker

OK. Can you give me a call later, OK.

00:08:15 Thomas Tanase

Sure.

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA   ☐ EEOC | |

EEOC Form 5 (11/09)

_State or local Agency, if any_                                                    and EEOC

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Thomas Tanase | 203-395-4609 | March 21, 1962 |

Street Address — 7991 Kenmore Drive, Mechanicsville, VA 23111      City, State and ZIP Code

Is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| Bowlero Corp / AMF Bowling Centers (aka Bowlmor) | | |

Street Address — 7313 Bell Creek Road, Mechanicsville, VA 23111      City, State and ZIP Code

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

Street Address      City, State and ZIP Code

**DISCRIMINATION BASED ON** (Check appropriate box(es))

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL  ORIGIN
☐ RETALIATION  ☐ AGE ☒  DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

**DATE(S) DISCRIMINATION TOOK PLACE**
Earliest: May 2023      Latest: June, 2023

☒ CONTINUING ACTION

I) My employment with Bowlmor began in 2001 where I started as vice president of Information technology (IT) working in Bowlmor's New York City office. I continued running my own company that offered point-of-sale (POS) systems on a part time basis.

II) In 2004, I was overwhelmed by the hours at Bowlmor and needed to take in 2 business partners to run my POS Business so I could concentrate entirely on Bowlmor business.

III) In 2013, Bowlmor purchased the 220+ bowling centers once operated as AMF in a bankruptcy acquisition and began its plans to remake all locations that would become Bowlmor operated bowling centers made into new hip entertainment centers catering to younger customers desiring to bowl as a form of entertainment, versus the traditional AMF league bowlers that enjoyed the game as a sport. This change was significant in terms of the sheer size in growth Bowlmor would take on as it had only 6-7 bowling centers as Bowlmor before the AMF purchase and the Bowlmor centers were already more fashionable centers with young attractive employees, new arcade games, enhanced food and alcoholic beverage menus all to attract a new wave of younger customers.

IV) From 2014 forward, after Bowlmor acquired the AMF bowling centers the company's employee turnover rate changed dramatically to a level I would estimate as high as 80-90% as it routinely terminated older employees and replaced them with much younger employees.

V) The alleged basis for these terminations ranged, but it was known within the company that if your appearance was old, or you were overweight and old you were subject to being 'managed out' which as an understood term throughout the company to find some basis to terminate a person, or to create circumstances that would lead to an employee constructively being terminated because of constant haranguing from management, unnecessary discipline and corrections and creating embarrassing situations for the employee making his/her employment nearly unbearable.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 8-10-2023     _Date_     _Charging Party Signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

| EEOC Form 5 (11/09) | CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| | This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☐ EEOC | |
| | | *State or ocalA enc  fan* | and EEOC |

**THE PARTICULARS ARE** *(if additional  paper is needed, attach extra sheet(s))*

VI)   In 2013, I was told my partial ownership of a POS company would be considered a conflict of interest (because they were trying to get the Bowlmor account), so I sold off my ownership in my POS company for substantially less than market value, to continue to work for Bowlmor.

VII)   In July, 2015 I became interim Chief Information Officer ("CIO") and one year later I became the permanent CIO and in this role I was able to add a lot of value to the company and was asked constantly to assist Bowlmor CEO Tom Shannon ("Shannon").

VIII)   In my 20-year history, Shannon was very much involved in personnel decisions and often needed assistance to conduct interviews with new candidates that often last 2-3 minutes and were essentially a means for him to judge the age and appearance of the candidate for youthfulness and physical attraction. Members of the company's sales or operations team would create the Zoom/Microsoft Teams meetings and often I was involved to help get the meeting functional on Shannon's computer.  I know first-hand many of these 'interview' lasted minutes.

IX)   Shannon openly conducted himself in a loose unfiltered manner showing no regard for anti-discrimination laws and often even made statements that were embarrassing to his peers, but we all were subservient to him as CEO of the company. His flagrant interest in women is known throughout the company as he often is on public display with new attractive women with him, even at functions more typical of management business meetings, where acquaintances or dates have no place in attending. On one occasion I was asked to program Shannon's telephone to make it appear as if he was in Germany when he was actually in Russia regarding a personal matter with a young woman he was romantically linked too. but didn't want his directors to know his whereabouts and what he was doing.

X)   Shannon often made open remarks and shared emails of his dislike of liberal-biased persons, he made racial and especially inappropriate "Blonde Women" jokes and always treated woman as an inferior class to men.

XI)   Bowlmor's policy to once ban "Timberland Boots" was designed to deter African American males from using the Bowlmor bowling centers. Another ban on wearing ballcaps backwards was also designed to deter African American males as customers.

XII)   Shannon was continuously engaging in personal relationships with women that were employed by Bowlmor and  many were then given much higher levels of authority and compensation. In instances where a complaint by a female would arise against conduct by Shannon, they would receive severance payments well beyond traditional career-ending severance that was always very low at Bowlmor as a means to silence any legal threats and all these payments were part of very strong severance agreements barring any such disclosure.

XIII)   Notwithstanding the open nature of conducts and remarks in the office, decisions at Bowlmor were often made in person or by telephone to avoid records.

XIV)   Since the initial filing of Charges of Discrimination (COD) filed by my counsel, Dowe Partners, LLC on behalf of 74 other former employees of Bowlmor for age discrimination and prior to my own termination, I often witnessed direct statements outwardly disparaging Daniel Dowe personally and seeking to take vindictive actions against him personally and professionally for what appeared to be normal work of his law firm.  Of equal measure were disrespectful statements about the EEOC and its authority to rule on the COD's and bring justice to aggrieved persons seeking redress from injuries sustained from Bowlmor's conduct.

XV)   Even with the two recent unfavorable decisions after long investigations by the EEOC finding Bowlmor in violation of federal anti-discrimination laws, Shannon and top executives at Bowlmor continued to share their open disdain of the proceedings and decisions and Mr. Dowe to create a false impression within the company that the EEOC matters lacked legal significance.

XVI)   The same conduct by Shannon and his executive team were on display relating to weaknesses in accounting controls and operational checks and balances found by its outside auditors, whereby typical to Bowlmor and Shannon they address it personally by casting aspersions at the accounting firms making these claims and then dismissing them.

XVII)   Prior to being terminated the very typical pattern of conduct of "managing out" ensued against me at Bowlmor whereby it installed a much younger person as someone that would 'help' me as my new supervisor.  Almost immediately there were signs of me being undermined by this person by having my staff meet with him in my absence and engaging him to develop closer working relationships with my staff all with the central purpose of trying to find some fact or statement I could have made to hold it against me as a pre-text to terminate my employment and fill my position with a much younger employee.

XVIII)   Knowing circumstances were ongoing that gave rise to believe my employment was coming to an end, I met with then Bowlmor president, Brett Parker, in April 2023 and he denied it.  There was a witness there who also complained about the treatment she was receiving.  I also expressed my concerns of constant harassment and disrespect to Danielle Capestany, the head of the HR department, on several occasions.

XIX)   The pressure of the harassment and condescension and ultimately of losing my position after giving 22 years of service in one industry and knowing that new employment prospects would be very challenging has caused me to seek medical help and a prescription to aid my anxieties.

XX)   In May 2023, Bowlmor created a hostile work environment for me leading to a telephone call with the person that was replacing me who then made a false statement that I resigned during our telephone call, which I did not do.  I never resigned and actually showed up for a normal day at work the following business day and went through two meetings before being contacted by Bowlmor human resources personnel to state my employment ended based on 'my resignation'.  I reiterated to this person that I did not resign and was actually at work when she contacted me.

XXI)   During the process to negotiate a severance package, Bowlmor sent me a draft of a Separation Agreement that specifically stated my 'employment was terminated' and not that I resigned thereby confirming in the writing that I my employment was terminated by Bowlmor.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agendes if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY- *When necessary for State or local Agency Requirements* |
| x | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| 8-10-2023<br>Date      Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☐ EEOC | |

| | and EEOC |
|---|---|
| | *State or localA enc :,fan* |

**THE PARTICULARS ARE** *if additional paper is needed, attach extra sheet(s)*

XXII)    I now believe that I was discharged because of my age (61) in violation of the Age Discrimination in Employment Act of 1967, as amended.

XXIII)    I believe that Bowlmor AMF has a practice of discriminating against older employees (both management and non-management) as a class by discharging them because of their ages (40 years and older) in violation of the Age Discrimination in Employment Act of 1967, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agendes if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY- *When necessary for State or Local Agency Requirements* |
|---|---|
| x | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct | SIGNATURE OF COMPLAINANT |
| 8-10-2023     *[signature]* | |
| Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *[month day year]* |

CP Enclosure with EEOC Form  5 (11/09)

**PRIVACY ACT STATEMENT:**  Under  the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1. FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2. AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3. PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4. ROUTINE USES.**  This form is used to provide  facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging party and respondent and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under  Title VII, ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement  or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment  Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may  also  be  first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings,  you must  ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION  REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken  against  you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section  4(d) of the ADEA, Section  503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified,  assisted, or participated in any manner in an investigation,  proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.