**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| AMF BOWLING CENTERS, INC., *et al.*, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-448–HEH |
| | ) | **REDACTED** |
| THOMAS TANASE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**
**(Granting Plaintiffs' Motion for Summary Judgment and
Amended Motion for Sanctions)**

THIS MATTER is before the Court on Plaintiffs AMF Bowling Centers, Inc.'s

and Bowlero Corp.'s (collectively, "Plaintiffs" or "Bowlero") Amended Motion for

Sanctions (the "Motion for Sanctions," ECF No. 111), filed on April 7, 2024, and

Plaintiffs' Motion for Summary Judgment (the ECF No. 119), filed on April 16, 2024

(collectively, the "Motions").

Defendant Thomas Tanase ("Defendant") filed his Opposition to the Motion for

Sanctions (ECF No. 140)[1] on April 29, 2024,[2] and his Opposition to Plaintiffs' Motion

---

[1] Defendant filed a Response in Opposition (ECF No. 139) and an accompanying Memorandum in Opposition (ECF No. 140) to Plaintiffs' Motion for Sanctions. All citations herein refer to the Memorandum in Opposition.

[2] On April 25, 2024, the Court ordered Defendant to file a response to Plaintiffs' Motion for Sanctions. (Order at 1, ECF No. 132.)

for Summary Judgment (ECF No. 152)[3] on May 7, 2024.  The Court heard oral argument

on the Motion for Sanctions on May 3, 2024.

The Court will dispense with oral argument on Plaintiffs' Motion for Summary

Judgment because the facts and legal contentions are adequately presented in the

materials before it, and oral argument would not aid in the decisional process.  *See* E.D.

VA. LOC. CIV. R. 7(J).  For the reasons that follow, the Court will grant Plaintiffs'

Motions.

## I. BACKGROUND

As required, the Court resolves all genuine disputes of material fact in favor of the

nonmoving party and disregards immaterial factual assertions.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).  Applying this standard, the Court concludes

that the following narrative represents the facts in this case.[4]

### A. Defendant's Employment with Bowlero

Defendant has worked for Bowlero or its predecessor, Strike Holdings, LLC, since

2002, and he eventually became the Chief Information Officer ("CIO").  (SUF ¶¶ 2–3.)

In 2015, Defendant signed a Confidential Information and Work Product Assignment

Agreement (the "Employment Agreement") with Bowlero.  (*Id.* ¶ 4.)

---

[3] Defendant filed a Response in Opposition (ECF No. 153) and an accompanying Memorandum in Opposition (ECF No. 152) to Plaintiffs' Motion for Summary Judgment.  All citations herein refer to the Memorandum in Opposition.

[4] The Court cites to the statement of undisputed facts ("SUF") contained in Plaintiffs' briefing wherever appropriate.  (Mem. in Supp. of Summ. J. at 3–17, ECF No. 126.)  Otherwise, the Court cites directly to Plaintiffs' exhibits.

The Employment Agreement includes an at-will employment provision which states, in relevant part, "employment with [Bowlero] is for an unspecified duration" and "th[e] employment relationship may be terminated by [Defendant] or [Bowlero] at any time, with or without notice or for any or no cause." (Ex. 4 § 1, ECF No. 120-4.) Section 2, titled "Confidential Company Information," requires that Defendant "hold in strictest confidence, and not to use or disclose to any person, firm or corporation, except for the direct benefit of [Bowlero] related to [his] work, any Confidential Information." (*Id.* § 2.) Section 10, titled "Returning Company Documents," states: "[Defendant] will return all documents and other tangible materials, whether or not pertaining to Work Products or Confidential Information, furnished to or accessed by [him] or produced or obtained by [him] in connection with [his] work hereunder upon [his] termination of employment or at any time upon request." (*Id.* § 10.) The Employment Agreement is governed by the laws of New York. (*Id.* § 19.)

On May 15, 2023, Defendant "had a verbal dispute" with his supervisor which resulted in the end of his employment. (SUF ¶ 9; Ex. 2 ¶ 6, ECF No. 120-3.) During this dispute, Defendant used the word "resign." (SUF ¶ 11; Ex. 2 ¶ 6; Ex. 3 ¶¶ 6–7, ECF No. 120-4.) The next day, Defendant texted his girlfriend "[t]hey accepted my resignation[;] I'm done" and "[i]t has been announced that I resigned[.]" (Ex. 7, ECF No. 120-4; Ex. 6 at 9:15–21, ECF No. 120-4.) Defendant also texted Bowlero's Chief Executive Officer ("CEO") Thomas Shannon ("Shannon"): "Tom, I was a bit upset. I did not mean to resign. I was at work at 9am this morning. Please help. I am part of this company and want to be until inretire [sic]." (Ex. 8, ECF No. 120-4.)

3

**B. Access of Bowlero's Systems and Servers**

Bowlero's Unique IDs and Passwords Policy prohibits former employees from using their unique login credentials to access Bowlero's systems and servers, effective on their last day of employment. (SUF ¶ 15; Ex. 6 at 132:17–134:4; Ex. 9 ¶¶ 6–9, ECF No. 120-5; Ex. 9A at 1–2, ECF No. 120-5.) On May 16, 2023, Bowlero cut off Defendant's access to its virtual private network ("VPN") and "[his] active directory access to access [Bowlero's] internal systems, their networks, and their datacenter." (Ex. 6 at 104:11–16, 105:11–22; Ex. 9 ¶¶ 9–10.) However, while employed as Bowlero's CIO, Defendant "had possession or knowledge of [] Shannon's login credentials." (SUF ¶ 17; Ex. 5 ¶ 122, ECF No. 120-4; *see also* Ex. 6 at 137:6–9; Ex. 1 ¶ 3, ECF No. 120-2.) As CEO, Shannon's emails contain highly confidential information and privileged communications. (SUF ¶ 19; Ex. 6 at 211:3–6, 211:21–25.) Defendant's authority to access Shannon's email account was revoked when his employment with Bowlero ended. (SUF ¶ 18; Ex. 5 ¶ 123.)

Bowlero uses Duo which "is a program that authenticates users to enable their access to Bowlero's email servers via webmail."[5] (SUF ¶ 21 (quoting Ex. 9 ¶ 11).) The

---

[5] As explained by Kevin Crossman ("Crossman"), Bowlero's Vice President of Information Technology ("IT"):

> Duo generally requires a multi-factor authentication, often received as a push notification or as a phone call. Once the additional authentication is received, the Duo proxy returns access approval to the requesting device or application. At each remote login, Duo creates a record of the time and physical location from which the webmail login occurred. Among other information, the Duo logs record the IP address accessing the given email account via webmail.

(Ex. 9 ¶ 11.)

Duo program produces automated logs of internet protocol addresses ("IP addresses")[6] that are used to access Bowlero's email systems. (SUF ¶ 22; Ex. 9 ¶¶ 11–12; *see also* Ex. 6 at 137:13–20.)  Defendant "believed that Shannon 'never had Duo [multi-factor authentication] enabled, and [Shannon] was always in bypass mode from the beginning of [Bowlero] using Duo.'" (SUF ¶ 23 (quoting Ex. 6 at 138:12–19, 138:24–139:1).) Bowlero also has Crowdstrike[7] installed on a majority of its computers.  (*Id.* ¶ 31.)

From around April 22, 2023, to June 20, 2023, Defendant "was the subscriber of IP address ███████████ (the '176 IP Address'), which was associated with [Defendant's] Virginia residence at 7991 Kenmore Drive, Mechanicsville, Virginia." (SUF ¶ 25; Ex. 11 ¶ 10, ECF No. 120-5; Ex. 12 ¶ 155, ECF No. 126-11; Ex. 13 at 2, ECF No. 126-12; Ex. 14 at 8, ECF No. 126-4 (showing a virtual signature (DocuSign) by "CIO" and "ttanase@bowlerocorp.com . . . Using IP Address ███████████ on May 16, 2023).)  From around January 1, 2023, to July 12, 2023, Defendant was also "the subscriber of IP address ███████████ (the '10 IP Address'), which was associated with 31 Parlor Rock R[oad], Trumbull, Connecticut." (SUF ¶ 26; Ex. 6 at 130:2–10, 149:5–151:2; Ex. 15 at 2, ECF No. 126-13.)

---

[6] IP addresses are comprised of "a unique strand of numbers assigned to each device connected to a network, usually the internet," and "identify all user activity on [a] home network . . . and its associated network devices . . . ." (Ex. 9 ¶ 11.)  In the words of Defendant, IP addresses are "like a street address but for the internet.  It's like a house address for the internet.  Every internet connection has an IP address." (Ex. 6 at 154:14–17.)

[7] Crowdstrike is a "cloud-based, anti-malware application" that "connects information on systems that are online and connected to the Internet." (SUF ¶ 31 n.2.)

After Defendant's employment ended, Bowlero began investigating whether Defendant was accessing its servers and systems. (SUF ¶ 20.)  During Defendant's employment, Defendant's 176 IP Address accessed his own Bowlero email account on the following dates in 2023: March 21 and 30; April 2, 4, 6, 12, 14, 17, 21, and 25; and May 1, 4, 8, 10, and 12. (Ex. 9E, ECF No. 126-2.)  Defendant accessed the internet at his Virginia residence on multiple days between April 14, 2023, and July 13, 2023. (SUF ¶ 28; Ex. 12 ¶ 157.)  The Duo logs demonstrate that Defendant's 176 AP Address accessed Shannon's Bowlero email account once on April 14, once on April 25, seven times on May 16, five times on May 17, once on May 18, three times on June 6, three times on June 7, four times on June 8, twice on June 9, twice on June 12, and once on June 13. (Ex. 9C at 1–2; ECF No. 126-2; *see* Ex. 6 at 144:5–146:19 (Defendant acknowledging "it appears" that his IP address shows on Shannon's Duo authentication log).)  Defendant was physically present at his Virginia residence on May 16–18, 2023 and June 6–8, 2023. (SUF ¶ 30; Ex. 12 ¶¶ 169–71, 179–81, 188–91, 217–18, 223–24, 231–32.)  Additionally, Bowlero's Crowdstrike data shows that Defendant's 176 IP Address accessed Bowlero's servers on or after May 17, 2023. (SUF ¶ 31; Ex. 9 ¶ 15.)

During Defendant's employment, Defendant's 10 IP Address accessed his own Bowlero email account on the following dates in 2023: March 27; April 7, 10, 27, and 28; and May 15. (Ex. 9E.)  The Duo logs demonstrate that Defendant's 10 IP Address accessed Shannon's Bowlero email account four times on June 2, twice on June 3, twice on June 4, and three times on June 5. (Ex. 9C at 1–2; *see* Ex. 6 at 149:5–151:8.)  Defendant was physically present at his Connecticut residence on June 2, 4, and 5, 2023,

and was located in Connecticut on June 3, 2023. (SUF ¶ 33; Ex. 12 ¶¶ 192–93, 199, 203–04, 209–10.)

On June 13, 2023, Crossman helped Shannon change the password to his Bowlero email account. (SUF ¶ 34; Ex. 9 ¶ 19.) The next morning, Crossman added a firewall to block Defendant's 176 IP Address from accessing Bowlero's servers. (SUF ¶ 35; Ex. 9 ¶ 20.) On June 15, 2023, the firewall successfully blocked attempts from Defendant's 176 IP Address to access Shannon's email account. (SUF ¶ 36; Ex. 9 ¶ 21.) When questioned about whether Defendant accessed Shannon's email account on or after May 17, 2023, Defendant originally asserted his Fifth Amendment right. (Ex. 18 ¶¶ 141–42, 148–49, ECF No. 121-2.) He then amended his response to deny the allegations. (Ex. 19 ¶¶ 141–42, 148–49, ECF No. 121-2.) However, at a later deposition, Defendant stated ████████████████████████████████████████████████ (Ex. 2 to Suppl. Mem. in Supp. at 25:2–26:3, ECF No. 175-1.) Defendant also asserted that ████████████████████████████████████████████████ ████████████████████████████████████████████████ (*Id.* at 22:5–24:8.)

On June 17, 2023, Bowlero, by counsel, sent Defendant a cease-and-desist letter detailing Defendant's unauthorized access of Shannon's email account and Defendant's retention of his Bowlero-issued laptop. (SUF ¶ 37; Ex. 17, ECF No. 121-2; Ex. 5 ¶ 105.) During Defendant's employment, Bowlero issued him a Dell XPS laptop, an iPad Pro, a reMarkable 2 tablet, and an HP windows tablet. (SUF ¶¶ 41–42; Ex. 11 ¶¶ 42–43; Ex. 5 ¶¶ 129–32.) Pursuant to Section 10 of Defendant's Employment Agreement, Defendant

7

was required to return all Bowlero-issued devices upon the end of his employment. (SUF ¶¶ 43–44; Ex. 4 § 10.) Defendant was aware of this policy. (Ex. 6 at 104:4–8, 134:11–16, 135:8–11.) Bowlero asked Defendant to return his Bowlero devices "a couple of times," but he did not return the devices until June 20, 2023, over thirty-five (35) days after his employment ended. (SUF ¶¶ 45, 51; Ex. 5 ¶¶ 129–32; Ex. 6 at 135:1–4.)

During that thirty-five (35) day period, Defendant accessed his Bowlero laptop. (SUF ¶ 47; Ex. 2 ¶¶ 21–24; Ex. 9 ¶¶ 15, 17–18.) Defendant did not believe he was authorized to access his Bowlero laptop post-employment. (SUF ¶ 46; Ex. 6 at 107:20–22, 108:19–109:3.) Defendant copied at least 2,100 files from a Bowlero folder onto a USB drive, some of which contained Bowlero's confidential information. (SUF ¶¶ 48–49, 53–54; Ex. 5 ¶ 115; Ex. 6 at 48:1–18; 55:13–21; Ex. 20 ¶¶ 9, 27, ECF No. 121-2.) Defendant kept the USB drive beyond his period of employment. (SUF ¶ 52; Ex. 6 at 205:14–206:3; *see also* Ex. 20 ¶ 9.) Defendant also completely "wiped," or erased, the contents of his Bowlero laptop. (SUF ¶ 50; Ex. 6 at 48:17–18, 256:23–25; Ex. 5 ¶ 133; *see also* Ex. 21, ECF No. 121-3; Ex. 22, ECF No. 121-4.)

Once Defendant returned his Bowlero-issued devices, Bowlero hired Sage Intelligence Group, LLC ("Sage") to conduct a forensic examination of the laptop. (SUF ¶ 55; *see* Ex. 20; Ex. 31, ECF No. 121-5.) Sage's services have cost well over $50,000 thus far. (SUF ¶ 56.) Bowlero has also incurred attorney's fees for litigating this case. (SUF ¶ 57.)

## C. Defendant's Post-Employment Communications

After the end of his employment, Defendant repeatedly contacted Bowlero personnel. (*See id.* ¶¶ 58–65.) On June 21, 2023, Defendant emailed Brett Parker ("Parker"), a Bowlero executive: "I am sorry to hear that you may have had a serious security and data breach. If true, disclosure of this material weakness to the Board of Directors, SEC, and shareholders will inevitably cause a negative and irreversible backlash to the already fragile reputation of Bowlero." (*Id.* ¶ 58 (quoting Ex. 33, ECF No. 121-5) (internal quotations omitted).) Defendant made multiple vulgar statements to Bowlero personnel, including:

"It gonna get ugly" (Ex. 34, ECF No. 122-1);

"I am going to war[;]" "They are fucked[;]" "David's gonna take down Goliath my friend. Get the popcorn ready." (Ex. 16, ECF No. 121-1);

He "would seek retribution against [Bowlero] for their wrongful treatment" (Ex. 2 ¶ 20; *see also* Ex. 3 ¶ 9);

If he were to sue Bowlero, "it would be strictly to fuck people over" (Ex. 6 at 167:24–168:22); and

"Your bosses are playing dirty. Time to go nuclear" (Ex. 22).

(SUF ¶¶ 59–60, 64–65.) Defendant also repeatedly sent images of Bowlero's stock price decreasing with statements indicating he is attempting to continue to lower the price. (*Id.* ¶¶ 61–63; Ex. 6 at 61:9–18, 63:24–64:17, 65:4–19, 66:18–67:10, 69:6–14; Ex. 16; Ex. 22; Ex. 35, ECF No. 122-2; Ex. 36-1, ECF No. 123-1; Ex. 37, ECF No. 125-1.)

**D. Defendant's Conduct Throughout this Litigation**

On March 11, 2024, Bowlero's counsel deposed Defendant. (SUF ¶ 67; *see* Ex. 6.) During this deposition, Defendant admitted that he lied under the penalty of perjury in his July 24, 2023 affidavit. (Ex. 6 at 49:13–24.) Defendant also stated he "accept[s] any punishment" for lying under the penalty of perjury. (*Id.* at 49:19–50:1.)

On March 4, 2024, Defendant produced a recording of a June 17, 2023 conversation between himself and Parker. (SUF ¶¶ 68–69; Ex. 39, ECF No. 125-3; Ex. 40, ECF No. 125-4.) On April 3, 2024, Defendant then filed a different version of the June 17, 2023 recording as an exhibit to his proposed counterclaim.[8] (SUF ¶¶ 70–72; Ex. 41, ECF No. 125-5; Ex. A to Am. Mot. for Sanctions ¶¶ 4–13, ECF No. 112-2; *see* Ex. 24, ECF No. 121-5 (showing additions and deletions between the different versions of the June 17 recording).) When compared to the latter produced June 17 recording, the originally produced recording omitted multiple statements, including:

> [Defendant:] I might have [accessed Shannon's web mail], someone might have logged in, it might have been my device.  Who knows, I had it on my phone.
> . . .
> [Defendant:] Not that I know of. I don't know what [sic] might have logged in with device [sic] I might have had running.
> . . .
> [Defendant:] His email could have been on one of my devices.  It could've been, it could have logged in, I'm not sure.
> . . .
> [Defendant:] Brett, I have nothing.  I'm not talking about anything else.  Like I said, there may be a device it may be an iPad, I don't know.  You could go through them.  But I haven't done anything illegal.
> . . .

---

[8] On June 3, 2024, this Court denied Defendant's Motion for Leave to File Counterclaim and to Add an Additional Party (ECF No. 100). (*See* Redacted Mem. Order at 10, ECF No. 168.)

[Defendant:] I'm not sure what you have but IP address knocking on a door [sic]. I get it.

[Parker:] Same IP address that you've used, it's your IP address.

[Defendant:] Could be and it won't be the last time somebody does that.

[Parker:] Well, it will because his passwords change[d] and his two factors turned on.

[Defendant:] Okay. Good.

. . .

[Defendant:] Again I don't know if there's a device that's trying to [access Shannon's email], could be, I'll look.

[Parker:] But it's not that kind of thing because it's not like it's knocking every five minutes, it's like going into the email several times a day, every day.

[Defendant:] Yeah, not me.

(Ex. 24 at 3–5.) Due to the differences between the two (2) recordings, this Court permitted Plaintiffs to depose Defendant regarding the recording. (Minute Entry at 1, ECF No. 150.) Accordingly, Bowlero's counsel deposed Defendant on May 14 and 22, 2024. (Suppl. Mem. in Supp. at 1, ECF No. 175.)

On March 2, 2024, Daniel Dowe, Esquire ("Dowe") sent Bowlero's counsel a letter that referenced the June 17 recording between Defendant and Parker. (*Id.* at 2; Ex. 1 to Suppl. Mem. in Supp. at 296:21–25, ECF No. 174-1.) Defendant stated that he did not review Dowe's letter before it was sent to Bowlero, and he did not know that the existence of the recordings was going to be disclosed to Bowlero. (Suppl. Mem. in Supp. at 2; Ex. 1 to Suppl. Mem. in Supp. at 297:1–3, 332:15–18.)

11

Defendant provided conflicting testimony in his depositions as to whether he notified his counsel of the existence of the June 17 recording. (Suppl. Mem. in Supp. at 2–3.) In his March 11 deposition, Defendant initially stated that he tried to give the recording to his attorney approximately four (4) to six (6) months prior but, his attorney "didn't accept them. Every time [he] told him about them, [the attorney] said don't worry about those. [He] offered them up multiple times, multiple times. . . ." (*Id.* at 162:22–166:8.) However, in his May 14 deposition, Defendant stated that he did not tell his attorneys prior to March 2, 2024, that he had a recording of the June 17 phone call. (Ex. 1 to Suppl. Mem. in Supp. at 344:20–345:15.) Later in the same deposition, Defendant stated that he did mention them to his prior attorney "several times," and "he wasn't interested." (*Id.* at 345:1–15.) Defendant then admitted that his prior testimony that he never disclosed the existence of the recordings to his attorneys was an incorrect statement. (*Id.* at 345:9–15.) During his May 22 deposition, Defendant again asserted that ███████████████████████████████████████████ (Ex. 2 to Suppl. Mem. in Supp. at 40:8–22.) While Defendant did produce and file an altered version of the June 17 recording in this case, he maintains that he does not know how the recording was altered. (*Id.* at 55:3–5.)

## II. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The relevant

inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Once a motion for summary judgment is properly raised and supported, the opposing party bears the burden of showing that a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019) (quoting *Anderson*, 477 U.S. at 248). A genuine issue concerning a material fact only arises when the evidence is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248. Neither a scintilla of evidence in support of the nonmoving party nor conclusory allegations or denials, without more, are sufficient to withstand a summary judgment motion. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citations omitted).

Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). "If the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50). When applying the summary judgment standard, courts "must construe the facts in the light most favorable to [the nonmoving party] and [] may not make credibility determinations or weigh the evidence." *Id.* at 213 (citations omitted).

### B. The Court Will Not Consider Defendant's Untimely Opposition or Affidavit to Plaintiffs' Motion for Summary Judgment.

Pursuant to Local Rule 7, the opposing party to a motion must file his response briefs and any supporting documents within fourteen (14) calendar days of the filings of the motion. E.D. VA. LOC. CIV. R. 7(F)(1). The movant then may file a reply brief within six (6) calendar days. *Id.* "Any requests for an extension of time relating to motions must be in writing and, in general, will be looked upon with disfavor." *Id.* at 7(I). "[I]gnorance of when a time period expires does not qualify as excusable neglect, nor does a busy schedule, lack of diligence, inadvertence, or other manifestations of carelessness and laxity." *Eagle Fire, Inc. v. Eagle Integrated Controls, Inc.*, No. 3:06-cv-264, 2006 WL 1720681, at *4 (E.D. Va. June 20, 2006) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)).

Plaintiffs timely filed their Motion for Summary Judgment on April 16, 2024. Thus, Defendant's opposition brief and any supporting documents were due on April 30, 2024. *See* E.D. VA. LOC. CIV. R. 7(F)(1). Defendant did not file his Opposition to the Motion for Summary Judgment until May 7, 2024—over a week late. Defendant did not file a request for an extension of time, nor did he address, or even mention, the fact that

14

his brief was untimely.  On May 8, 2024, Defendant filed an affidavit (ECF No. 154) in

support of his untimely opposition brief.  Defendant again offered no explanation for his

untimely affidavit.  Without an explanation for Defendant's untimely filings, the Court

cannot consider whether "excusable neglect" exists under Federal Rule of Civil

Procedure 6(b)(1)(B).  Defendant's Opposition and affidavit plainly violate Rule 7(F)(1),

and the Court will not consider either filing.[9]  Consequently, the Court considers

Plaintiffs' Motion for Summary Judgment unopposed.

The Court's analysis does not end here.  "Although the failure of a party to

respond to a summary judgment motion may leave uncontroverted those facts established

by the motion, the moving party must still show that the uncontroverted facts entitle the

party to 'a judgment as a matter of law.'"  *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410,

416 (4th Cir. 1993).  Accordingly, the Court will analyze whether summary judgment for

Plaintiffs is appropriate in this case.

### C. The Court Will Grant Summary Judgment for Plaintiffs.

Plaintiffs assert that summary judgment is proper because no reasonable jury

could find in favor of Defendant based on the record in this case.  (Mem. in Supp. of

Summ. J. at 19.)  The Court agrees.

---

[9] The Court notes that this is not Defendant's first time missing a filing deadline in this case.
This Court, and the Honorable Mark R. Colombell, have graciously provided Defendant with
additional time to respond on multiple occasions.  (*See, e.g.*, Order at 1–2, ECF No. 114; Order
at 1, ECF No. 127; Order at 1, ECF No. 132; Order at 1–2, ECF No. 157.)  However, the Court's
patience has worn thin.

### 1. Count I: Computer Fraud and Abuse Act

Plaintiffs contend they are entitled to summary judgment on Count I because there is no dispute that Defendant intentionally accessed his Bowlero-issued laptop and Shannon's Bowlero email account after his employment ended. (*Id.* at 20.) Plaintiffs also assert that it is undisputed that Defendant lacked authorization to access the laptop and Shannon's email. (*Id.* at 21.) Lastly, Plaintiffs argue that they have suffered at least $50,000 of damages in investigating Defendant's unauthorized access. (*Id.* at 21–22.)

The Computer Fraud and Abuse Act ("CFAA") is "primarily a criminal statute designed to combat hacking." *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 201 (4th Cir. 2012) (citing *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 645 (4th Cir. 2009)). However, a private party who suffers damage or loss due to a violation of the CFAA may bring a civil action "to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* (quoting 18 U.S.C. § 1030(g)) (internal quotations omitted). A person violates the CFAA when he:

> (1) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer, in violation of § 1030(a)(2)(C);
> (2) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, in violation of § 1030(a)(4); or
> (3) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[,] or . . . causes damage and loss, in violation of § 1030(a)(5)(B)-(C).

*Id.* (internal quotations omitted) (alterations in original). Plaintiffs assert that Defendant violated § 1030(a)(2)(C) of the CFAA. (*See* Mem. in Supp. of Summ. J. at 19–22.)

Defendant's employment with Bowlero ended on May 15, 2023, after a "verbal dispute" with his supervisor. (SUF ¶ 9; Ex. 2 ¶ 6.) Defendant maintained possession over his Bowlero laptop and other Bowlero electronic devices for over thirty-five (35) days following the end of his employment. The IP Address evidence and Duo logs show that, during this period, Defendant accessed Shannon's Bowlero email account on multiple occasions post-employment. Thus, there is no dispute that Defendant accessed his Bowlero laptop and Shannon's email account after May 15, 2023.

Turning to whether Defendant had authorization to access his laptop and Shannon's email post-employment, the Court first notes that "the fact that [Defendant] no longer worked for [his employer] when he accessed its server logically suggests that the authorization he enjoyed during his employment no longer existed." *United States v. Steele*, 595 F. App'x 208, 211 (4th Cir. 2014) (citations omitted); *see also Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 925 (E.D. Va. 2017) (finding that "any authorization [to access his work account] undoubtedly was rescinded upon his termination"). In this case, Defendant admitted that he "knew it was policy that, you know, once you're terminated that you don't have privilege to use computer[s] or any belongings or things that Bowlero owns," and that he "didn't believe [he] was authorized to access it." (Ex. 6 at 104:4–8, 108:19–109:3.) Defendant also stated that he was aware of Bowlero's policy that all devices must be returned at the conclusion of his employment. Defendant's own statements indicate that he knew he lacked authorization to access his Bowlero laptop after his employment ended. Accordingly, the record makes clear that Defendant did not have authorization to access Bowlero's laptop or server after

the end of his employment. *See Glob. Pol'y Partners, LLC v. Yessin*, 686 F. Supp. 2d

631, 636 (E.D. Va. 2009) (holding that the plaintiff sufficiently pled a CFAA violation

because the defendant "used a password to access an e-mail account that did not belong

to him").

   Defendant also admitted to copying at least 2,100 files from a Bowlero folder onto

a USB drive and erasing the contents of his Bowlero laptop *after* his employment ended.

Thus, Plaintiffs have proven that Defendant obtained information—at least 2,100 files

worth of information—from his unauthorized access of the laptop.

   Under 18 U.S.C. § 1030(g), Plaintiffs may recover consequential damages

including the "cost of investigating and identifying the CFAA offense." *iParadigms*, 562

F.3d at 646; *see also Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 927.

Bowlero hired Sage to investigate Defendant's unauthorized access in this case. Sage has

billed over $50,000 to Bowlero for its forensic examination of Defendant's Bowlero-

issued laptop. Accordingly, Plaintiffs have shown they suffered sufficient losses and are

entitled to recover these damages under the CFAA.

   Based on this evidence and Defendant's admissions, the Court finds that there is

no genuine dispute of material fact that Defendant violated the CFAA. Defendant

intentionally accessed Bowlero's protected computer[10] without authorization after his

employment ended, and obtained information, including 2,100 files, from this

---

[10] "[A]ny computer with Internet access is a protected computer and, thus, is a subject of the
[CFAA's] protection." *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 926 (collecting
cases) (internal quotations and citations omitted) (second alteration in original).

unauthorized access. This violation resulted in losses for Plaintiffs of at least $50,000.
Thus, the Court will grant Plaintiffs' Motion for Summary Judgment on Count I.

### 2. Count II: Virginia Computer Crimes Act

Plaintiffs argue that they are entitled to summary judgment on Count II because
Defendant copied Bowlero's files to a USB drive and erased the contents of his Bowlero-
issued laptop. (Mem. in Supp. of Summ. J. at 23.) Plaintiffs assert that Defendant acted
with malicious intent. (*Id.* at 23–24.) Additionally, Plaintiffs contend that it is
undisputed that they suffered damages from Defendant's Virginia Computer Crimes Act
("VCCA") violation, and, therefore, they are entitled to the cost of investigating
Defendant's violations and reasonable attorneys' fees as punitive damages. (*Id.* at 24–
25.)

To prevail on a violation of the VCCA claim, a plaintiff must demonstrate that the
defendant acted

> with malicious intent, or through intentionally deceptive means and without
> authority, to:
>
> (3) Alter, disable, or erase any computer data, computer programs or
> computer software; [or]
>
> . . .
>
> (6) Use a computer or computer network to make or cause to be made an
> unauthorized copy, in any form, including, but not limited to, any printed or
> electronic form of computer data, computer programs or computer software
> residing in, communicated by, or produced by a computer or computer
> network[.]

VA. CODE ANN. § 18.2-152.4(A). For purposes of the VCCA, "[a] person is 'without
authority' when he knows or reasonably should know that he has no right, agreement, or
permission or acts in a manner knowingly exceeding such right, agreement, or

permission." *Id.* § 18.2-152.2; *see also Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306

F. Supp. 3d 845, 855 (E.D. Va. 2018).

Although it is not necessary to show malicious intent under the VCCA,

establishing malicious intent entitles the movant to punitive damages. *See Ryan v. Quick*,

No. 4:09-cv-51, 2010 WL 11566375, at *3 (E.D. Va. Jan. 15, 2010); *Tech Sys., Inc. v.

Pyles*, No. 1:12-cv-374, 2013 WL 4033650, at *3 (E.D. Va. Aug. 6, 2013), *aff'd*, 630 F.

App'x 184 (4th Cir. 2015). "[A]ctual malice may be shown if the defendant's actions

were prompted by ill will, malevolence, grudge, spite, wicked intention or a conscious

disregard of the rights of another." *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227

(Va. 1981) (internal quotations and citation omitted).

As previously explained, it is undisputed that Defendant accessed his Bowlero-

issued laptop without authority because Defendant knew of Bowlero's policy that

prohibited use of its computers after termination, and he did not believe he was

authorized to access the laptop post-employment. *See supra* Section II.C.1. Thus,

Defendant knew or reasonably should have known that he had no right to access, alter,

disable, or erase any computer data on the Bowlero laptop.

There is also no material dispute of genuine fact that Defendant erased contents of

the laptop and made an unauthorized copy of Bowlero's computer data. *See id.*

Defendant admitted that he downloaded and copied a minimum of 2,100 files, including

confidential documents, from Bowlero's computer onto a USB drive. *See id.*; (*see also*

Exs. 25–30, ECF No. 121-5 (showing a sample of confidential documents that Defendant

copied from the Bowlero laptop onto the USB drive).) He also admitted that he

completely erased the contents of the laptop. *See id.* Thus, the record supports that Defendant erased and made unauthorized copies of Bowlero's computer data in violation of the VCCA.

Additionally, the record shows that Defendant acted with malicious intent when he accessed Bowlero's server without authorization and copied and erased computer data from his Bowlero-issued laptop. First, Defendant emailed Parker stating that he heard Bowlero had "a serious security and data breach," and that "disclosure of this material weakness" would result in "negative and irreversible" damage to Bowlero's reputation. (Ex. 33.) After the end of his employment, he made numerous vindictive comments to Bowlero employees, including that he wanted "retribution," was "going to war," and that Bowlero is "fucked." (Ex. 2 ¶ 20; Ex. 3 ¶ 9; Ex. 16.) He also indicated he was attempting to tank Bowlero's stock price. Thus, Defendant's actions and statements establish that he acted with ill will, grudge, and spite against Bowlero.

Second, despite knowing that he lacked authorization Defendant nonetheless accessed his Bowlero-issue laptop, copied 2,100 files onto a USB drive, and wiped the contents of the laptop. This constitutes a conscious disregard of Bowlero's rights and resulted in approximately $50,000 of damages to investigate and remedy Defendant's malicious actions.

The evidence establishes that Defendant violated the VCCA and acted with malicious intent. Accordingly, the Court will grant Plaintiffs' Motion for Summary Judgment on Count II and award Plaintiffs damages and reasonable attorneys' fees and costs. *See Pyles*, 2013 WL 4033650, at *3 (awarding the plaintiff reasonable attorneys'

fees and the cost of litigation because the defendant violated the VCCA with malicious intent).

### 3. Count III: Trespass to Chattels

Plaintiffs assert that they are entitled to summary judgment on Count III because Defendant "intentionally used, intermeddled with, and intruded on Bowlero's computer systems" by repeatedly accessing Shannon's email and copying Bowlero's files onto a USB drive after the end of his employment. (Mem. in Supp. of Summ. J. at 26.) They argue that Defendant's actions were taken with actual malice and injured "Bowlero's possessory interests in its computer systems and its business goodwill." (*Id.* at 26–27.) Accordingly, Plaintiffs state that they are entitled to both compensatory and punitive damages on Count III. (*Id.* at 27–28.)

Under Virginia law, "[a] trespass to chattels occurs 'when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization,' . . . and 'if the chattel is impaired as to its condition, quality, or value.'" *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 320 (E.D. Va. 2009) (quoting *Am. Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444, 451–52 (E.D. Va. 1998)). "The unauthorized intrusion into an individual's computer system through hacking, malware, or even unwanted communications supports actions under [a trespass to chattels claim]." *Microsoft Corp. v. Does 1-18*, No. 1:13-cv-139 (LMB/TCB), 2014 WL 1338677, at *9 (E.D. Va. Apr. 2, 2014).

It is undisputed that Defendant intentionally used or intermeddled with Bowlero's computer and servers without authorization by repeatedly accessing Shannon's email and

copying 2,100 of Bowlero's files onto a personal USB drive after the end of his employment. *See supra* Section II.C.1–2. Thus, the Court must consider whether Defendant's actions impaired Bowlero's property.

In *Am. Online, Inc. v. IMS*, the court found that the defendant committed trespass to chattels by sending over 60 million unsolicited bulk emails to the plaintiff's computer network in a ten (10) month period. 24 F. Supp. 2d 548, 550–51 (E.D. Va. 1998). The Court found that the defendant's intentional and unauthorized contact with the plaintiff's computer network "injured [the plaintiff's] business goodwill and diminished the value of its possessory interest in its computer network." *Id.* at 550. Similarly, in *State Analysis*, the court found that the plaintiff adequately pled a trespass to chattels claim because the defendant accessed password-protected parts of the plaintiff's website without permission. 621 F. Supp. 2d at 320. The court determined that, because the plaintiff charged fees for its passwords, the defendant's unauthorized access of password-protected areas diminished the value of the plaintiff's possessory interest in its website. *Id.*

Here, like in *IMS* and *State Analysis*, the record establishes that Defendant's intentional and unauthorized access injured Bowlero's possessory interest in its computer systems and its business goodwill. Defendant's unauthorized access also diminished the value of Bowlero's possessory interest in its email accounts. This is because Shannon's email was password-protected, and his email contained highly confidential information and privileged communications. Notably, Defendant himself recognizes that a "security and data breach" is a "material weakness" that "will inevitably cause a negative and

23

irreversible backlash to the already fragile reputation of Bowlero. . . ." (*Id.* ¶ 58; Ex. 33.) Accordingly, there is no dispute that Defendant's trespass impaired Bowlero's business goodwill and possessory interests.

Plaintiffs seek punitive damages on Count III because they assert that Defendant's spite and conscious disregard of Plaintiffs' rights constitute actual malice. (Mem. in Supp. of Summ. J. at 27–28.) As the Court previously found, Defendant knew he was not authorized to access Bowlero's devices or servers after his employment, yet he continued to do so on numerous occasions. *See supra* Section II.C.1–2. Additionally, Defendant knew the breach would cause irreversible damage and made numerous comments that he wanted "retribution" against Bowlero and he was seeking to "fuck [] over" Bowlero. (Ex. 2 ¶ 20; Ex. 3 ¶ 9; Ex. 6 at 167:24–168:22; Ex. 16.) Thus, it is undisputed that Defendant acted with actual malice.

Plaintiffs have satisfied all elements of their trespass to chattels claim and have shown that they are entitled to punitive damages based on Defendant's malicious conduct. Accordingly, Plaintiffs' Motion for Summary Judgment as to Count III will be granted and the Court will award Plaintiffs punitive damages.

### 4. Count IV: Breach of Contract

Plaintiffs contend that they are entitled to summary judgment on Count IV because a valid employment contract between Bowlero and Defendant exists, and Plaintiffs performed in accordance with the contract, while Defendant breached Section 10 of the Employment Agreement by failing to timely return his Bowlero-issued devices. (Mem. in Supp. of Summ. J. at 28–29.) Plaintiffs also state that Defendant's breach caused

Bowlero cognizable damages which entitle Plaintiffs to injunctive relief and nominal damages. (*Id.* at 29.)

Under New York law, to successfully plead a breach of contract claim, a plaintiff must show that: "(1) a contract exists; (2) [the] plaintiff performed in accordance with the contract; (3) [the] defendant breached its contractual obligations; and (4) [the] defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) (internal citations omitted). Not only must a plaintiff demonstrate the existence of a contract, but the plaintiff "must identify the provisions of the contract that were breached." *Barker v. Time Warner Cable, Inc.*, 923 N.Y.S.2d 118, 120 (2011) (citations omitted). The breaching party is liable for foreseeable damages. *Ashland Mgmt. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993). "[N]ominal damages are always available in breach of contract actions" under New York law. *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (quoting *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 987 (N.Y. 1993)) (internal quotations omitted) (alteration in original).

There is no dispute that the Employment Agreement is a valid contract between Bowlero and Defendant or that Bowlero performed in accordance with the contract by employing Defendant at-will. (SUF ¶¶ 4, 6; Ex. 4.) Section 10 of the Employment Agreement required Defendant to return all Bowlero documents and materials at the end of his employment. Defendant admitted he was aware of this requirement, yet failed to return his Bowlero-issued devices for over thirty-five (35) days after the end of his employment, in direct violation of this contractual provision. Defendant also ignored

Bowlero's requests that he return these devices.  Additionally, Defendant admits that he downloaded Bowlero's documents onto a personal USB drive post-employment.  Thus, it is clear that Defendant breached Section 10 of his Employment Agreement.

Defendant's breach of the Employment Agreement resulted in cognizable damages.  Because Defendant did not return his Bowlero-issued devices and thousands of Bowlero documents, Bowlero tasked its personnel and Sage with investigating and remedying Defendant's breach.  This was done at Bowlero's expense.  Even if Plaintiffs' damages were uncertain or speculative, they are entitled nominal damages under New York law.  *See Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977).

Accordingly, there is no genuine dispute of material fact and Plaintiffs have established a breach of contract claim under New York law.  The Court will grant Plaintiffs' Motion for Summary Judgment as to Count IV and award Plaintiffs injunctive relief and nominal damages.

### III.  AMENDED MOTION FOR SANCTIONS

Although the Court will grant Plaintiffs' Motion for Summary Judgment, because of Defendant's egregious conduct in this case, the Court will nonetheless analyze and grant Plaintiffs' Motion for Sanctions.

Plaintiffs seek sanctions against Defendant for making "a mockery out of the judicial process by producing doctored evidence and lying under oath." (Mem. in Supp. of Am. Mot. for Sanctions at 1, ECF No. 112.)  Plaintiffs assert that Defendant produced a doctored version of the June 17, 2023 recorded phone call in this case.  (*Id.* at 2.)  They

26

also contend that Defendant has lied throughout this litigation and has admitted to

committing perjury. (*Id.*) Based on Defendant's production of doctored evidence and

perjury, Plaintiffs request the Court enter the following sanctions against Defendant:

> 1. grant[] default judgment in Bowlero's favor and against [Defendant] as to
> liability, or, alternatively, to preclude [Defendant] from further affirmative
> testimony in this matter;
>
> 2. grant[] Bowlero the opportunity to depose [Defendant] within seven (7)
> days from the date of the entry of this order, or as soon as possible thereafter
> as counsel may mutually agree, on the Originally Produced June 17
> Recording, including to question [Defendant] about the circumstances under
> which such recording was modified;[11] and
>
> 3. order[] [Defendant] to pay Bowlero's attorneys' fees and costs in
> connection with investigating the issues related to the manipulation of the
> Originally Produced June 17 Recording and preparing its initial and amended
> Motion for Sanctions, and supporting memoranda of law as well as for
> continuing to litigate the Amended Motion.

(Am. Mot. for Sanctions ¶¶ 1–3; *see* Mem. in Supp. of Am. Mot. for Sanctions at 17–23.)

Defendant asserts that Plaintiffs' Motion for Sanctions is an attempt "to win this

case without having any evidence to support their claims." (Resp. in Opp'n at 1.)

Defendant first notes that he amended his prior affidavit to correct his false statements.

(*Id.* at 5–7.) As to the doctored recording, Defendant states that he initially lost the

recording device, but, once it was found, he disclosed it to Plaintiffs. (*Id.* at 7.) He

explains that the recording device was lost sometime after it was made in 2023. (*Id.*)

Then, in February 2024, Defendant's son took Defendant's vehicle to a car dealership

---

[11] At the hearing held on May 3, 2024, Defendant's counsel agreed that it was appropriate to permit Plaintiffs to depose Defendant about the June 17 recording. Thus, the Court granted Plaintiffs' Motion for Sanctions as to the deposition, and Defendant was deposed on May 14 and 22, 2024.

and the dealership workers found the device when servicing and detailing the vehicle. (*Id.*) Defendant's son then held onto the recording device and sent the recording to Defendant's prior counsel. (*Id.*) Defendant retrieved the device on March 15, 2024. (*Id.* at 8.) Defendant states "there was no doctoring" and he "does not know why there is a difference" between the two June 17 recordings. (*Id.*) Lastly, to the extent Plaintiffs assert Defendant's invocation of his Fifth Amendment rights during his deposition as a basis for sanctions, Defendant argues he did so because "he had been threatened with criminal prosecution" and that Plaintiffs' and their counsel's actions "were designed to have Defendant [] invoke his Fifth Amendment rights." (*Id.*)

It is within a court's inherent authority and discretion to sanction a litigant who acts in "bad faith, vexatiously, wantonly, or for oppressive reasons," including when a party practices a fraud upon the court or disrupts litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (internal quotations and citations omitted). To impose such sanctions, a court must provide specific findings of how the offending party acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Kilborn v. Bakhir*, 70 F. App'x 692, 694 (4th Cir. 2003); *see also Parker v. N.C. Agr. Fin. Auth.*, 341 B.R. 547, 554–55 (E.D. Va. 2006). In determining whether a party acted in bad faith, a court may consider both "the actions that led to the lawsuit" and the conduct throughout the litigation. *Stradtman v. Republic Servs., Inc.*, 121 F. Supp. 3d 578, 581 (E.D. Va. 2015) (quoting *Roadway Express Inc. v. Piper*, 447 U.S. 752, 766 (1980)) (internal quotations omitted). In the Fourth Circuit, "it is unclear whether a subjective or objective bad faith standard applies." *Id.* at 587–88.

"When a party deceives a court or abuses the process at a level that is utterly

inconsistent with the orderly administration of justice or undermines the integrity of the

process, the court has the inherent power to dismiss the action." *United States v. Shaffer*

*Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). Submitting false or fabricated evidence is

"the most egregious misconduct which justifies a finding of fraud upon the Court."

*Salgam v. Adv. Software Sys., Inc.*, No. 1:18-cv-29 (AJT/TCB), 2020 WL 6322857, at *4

(E.D. Va. July 2, 2020) (citation omitted), *aff'd*, 2023 WL 5165275 (4th Cir. Aug. 11,

2023).

In determining whether default judgment or other sanctions are appropriate, courts

consider the following six (6) factors:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's
> blameworthiness if the wrongful conduct is committed by its attorney,
> recognizing that we seldom dismiss claims against blameless clients; (3) the
> prejudice to the judicial process and the administration of justice; (4) the
> prejudice to the victim; (5) the availability of other sanctions to rectify the
> wrong by punishing culpable persons, compensating harmed persons, and
> deterring similar conduct in the future; and (6) the public interest.

*Shaffer Equip.*, 11 F.3d at 462–63. The Court will analyze each factor in turn, but will

first discuss Defendant's disturbing pattern of behavior since the end of his employment

and throughout this litigation.

Prior to this litigation, Defendant has made repeated vulgar and vindictive

statements about Bowlero and its personnel. He then repeatedly accessed his Bowlero

laptop and Shannon's email account without authorization, copied files and confidential

documents, and erased the contents of the laptop.

On July 25, 2023, Defendant submitted an affidavit to this Court that included false statements, which resulted in the withdrawal of his prior counsel for ethical reasons. (*See* Order at 1–2, ECF No. 79.)  During his March 11, 2024 deposition, Defendant admitted that he committed perjury in his affidavit and stated he "take[s] full responsibility" and "accept[s] any punishment" for his actions.  (Ex. 6 at 49:13–50:1, 102:17–23.)

On March 2, 2024, Dowe sent Bowlero's counsel a letter that referenced recorded phone calls between Defendant and Parker.  This was the first time Bowlero was made aware of the recordings because Defendant did not produce them, or even disclose their existence, in discovery.[12]  Two days later, Defendant's former counsel produced the recordings to Bowlero's counsel, including the June 17, 2023 recording.  On April 3, 2024, Defendant filed a transcript of the June 17 recording that omitted significant portions of the call when compared to the originally produced recording.

When Plaintiffs questioned Defendant about the late production of the recordings and doctored transcript, Defendant changed his story multiple times.  Initially, in his March 11, 2024 deposition, Defendant stated he tried to give the recordings to his former attorney multiple times but the attorney refused to accept them.  He claimed he attempted to turn over the recordings four (4) to six (6) months prior, meaning between September

---

[12] Defendant's late disclosure and production of this evidence is particularly concerning because the Court, and Plaintiffs' counsel, have no way of knowing if Defendant has withheld any other evidence in this case. *See Mutual Fed. Sav. & Loan Ass'n v. Richards & Assocs.*, 872 F.2d 88, 93 (4th Cir. 1989) (affirming default judgment where the district court found no other sanction would be appropriate "because without the essential discovery materials, the case could be more difficult to try").

to November, 2023. Then, in Defendant's May 14, 2024 deposition, Defendant asserted that he never told his attorneys about the recordings prior to March 2, 2024—a direct contradiction of his previous testimony. Later in that same deposition, Defendant reverted to his original statement, and alleged he did tell his former attorney about the recordings but the attorney was not interested, and admitted his statement to the contrary was incorrect. However, Defendant again changed his testimony in his May 22, 2024 deposition, when he again stated that ████████████████████████████

████████████████

Now, in response to Plaintiffs' Motion for Sanctions, Defendant tells a less-than-believable story about the recording. He asserts that he lost the recording due to a car accident and did not find it until February 2024—despite his prior testimony that he tried to disclose the recording to his attorney between September and November 2023. Defendant then implies that his son or workers at a car dealership may have doctored the recording because he did not retrieve the recording until March 15, 2024, after his former attorney provided it to Plaintiffs' counsel. The Court is concerned by Defendant's vindictive behavior, changing testimony, and concocted stories in this case.

As to Defendant's culpability, Defendant himself admitted to committing perjury in this case. Defendant stated he takes full responsibility and accepts punishment for his perjury. Thus, he will have the opportunity to do so. Additionally, Defendant repeatedly changed his testimony across, and within, multiple depositions, and filed materially

31

altered evidence.[13]  Although Defendant denies that he doctored any evidence in this

case, he provides no explanation for how the June 17 recording was altered.  Plaintiffs, on

the other hand, have shown by clear and convincing evidence that Defendant knowingly

produced a fraudulent recording to this Court.  *See Salgam*, 2020 WL 6322857, at *4

(finding the defendant demonstrated sufficient evidence that the plaintiff produced altered

emails despite the plaintiff's assertion that he did not fabricate or doctor any emails

produced in the case).

The Court finds that Defendant, and not his former or current counsel, is

responsible for his perjury, lies, and submission of fabricated evidence.  Defendant's

vindictive remarks support that Defendant acted on his own.  There is no evidence that

any of his counsel knew or condoned his behavior.  In fact, one of his previous attorneys

withdrew immediately upon discovery of Defendant's perjury.  Additionally, according

to Defendant's recitation of the facts, only his son and the dealership workers had the

"lost" recording device prior to its production to Plaintiffs' counsel.  However, there is no

indication that these individuals had any motive to alter the recording.  The omissions

from the altered June 17 recording support the Court's finding because the omitted

statements are unfavorable to Defendant in this case.

Defendant's actions prejudiced the judicial process, administration of justice, and

Bowlero.  Submitting doctored evidence is inexcusable, and Bowlero incurred additional

---

[13] The Court notes that, during oral argument on Plaintiffs' Motion for Sanctions, it warned
Defendant that additional lies may result in sanctions in this case.  However, Defendant did not
heed the Court's warning.

attorneys' fees and investigatory costs due to Defendant's perjury and production of altered evidence. Thus, default judgment is warranted to remedy Defendant's fraud upon the Court. *See id.* at *4–5 (finding dismissal with prejudice appropriate to rectify the plaintiff's production of falsified evidence); *see Liva v. Cnty. of Lexington*, No. 91-2337, 1992 WL 187299, at *1–2 (4th Cir. Aug. 6, 1992) (affirming the district court's dismissal of a case under the court's inherent power because the plaintiff presented false evidence to support a personal injury claim). This sanction will appropriately punish Defendant, compensate Bowlero, deter similar conduct in the future, and serve the public interest. *See Brooks Sports, Inc. v. Anta (China) Co.*, No. 1:17-cv-1458 (LO/TCB), 2018 WL 7488924, at *18 (E.D. Va. Nov. 30, 2018) (recommending the sanction of default judgment due to the defendant's bad faith conduct), *R. & R. adopted*, 2019 WL 969572 (E.D. Va. Jan. 11, 2019).

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment and Motion for Sanctions will be granted. The Court will separately consider and determine the monetary damages and injunctive relief owed to Plaintiffs.

An appropriate Order will accompany this redacted Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: June 13, 2024
Richmond, Virginia

33